LANKFORD AND OTHERS, COMPOSING THE STATE BANKING BOARD OF THE STATE OF OKLAHOMA, v. PLATTE IRON WORKS COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF OKLAHOMA

No. 381. Argued October 14, 15, 1914.—Decided January 5, 1915.

The decision of state tribunals in regard thereto is an important element to be considered in determining the interest which the State has in a fund administered by a state board.

The state courts of Oklahoma having held that the statute creating the State Banking Board intended to give the State a definite title to the Depositors' Guaranty Fund, the fact that the fund is to be used to satisfy claims of beneficiaries does not take its administration from the officers of the State or subject them to judicial control. This court will not assume that the fund will not be faithfully managed and applied. *Murray* v. *Wilson Distilling Co.*, 213 U. S. 151.

A suit by a depositor in a bank in Oklahoma against members of the State Banking Board and the Bank Commissioner of Oklahoma to compel payments from, distribution of, and assessments for, the Depositors' Guaranty Fund, is a suit against the State, and, under the Eleventh Amendment, cannot be maintained in the Federal court.

THE facts, which involve the application of the Eleventh Amendment to suits brought in the Federal courts against the members of the State Banking Board of Oklahoma to compel payments from, and distribution of, the Depositors' Guaranty Fund of that State, are stated in the opinion.

*Mr. Charles West*, Attorney General of the State of Oklahoma, for appellants:

The action is against the State of Oklahoma. Defendants are sued in their official capacity. The relief sought is such as could only be granted against them as officials of the State. They have no personal interest in the litiga-

tion. Were they not officers of the State they could not in any way comply with the decree rendered. The bill seeks payment of the plaintiff's claim out of the Depositors' Guaranty Fund or if the cash available be insufficient to issue Depositors' Guaranty Fund Warrants in payment of same.

The Supreme Court of Oklahoma held, that the Depositors' Guaranty Fund is a fund of the State, and that the State had a first lien on the failed bank's assets to discharge whatever the State should advance for it. *State v. Cockrell*, 27 Oklahoma, 630; *Lankford v. Oklahoma Engraving Co.*, 130 Pac. Rep. 278.

The object of the law is to serve public not private rights. Whether or not the Oklahoma Act served a private or a public purpose was the basis of the decision of this court in *Noble State Bank v. Haskell*, 219 U. S. 104; *S. C.*, 219 U. S. 575.

The essence of the law is not to establish a private right but to conserve public welfare; and, as such, no justiciable rights in the depositors are to be presumed to arise; the law was not primarily enacted to return to the depositor his money, but more properly to prevent the public injury by bank panics. Nowhere is there language used showing an intent to give to a depositor the right to sue. See § 1, ch. 22, Sess. Laws, 1913; § 6, ch. 22, Sess. Laws, 1913.

With the exercise of a high executive discretion, the courts will not interfere. *Decatur v. Paulding*, 14 Pet. 497.

An action to compel state officers to pay a claim from a state fund in their charge, which they, in the exercise of an executive discretion, refused to pay, is an action against the State. *Governor of Georgia v. Madrazo*, 1 Pet. 110, 123; *Smith v. Reeves*, 178 U. S. 436.

An action to compel payment by the Treasurer of the State of a sum unlawfully collected as taxes is one to compel the State to pay out money from its funds and

therefore one against the State. See *Re Ayers*, 123 U. S. 443; *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 10; *Louisiana* v. *Jumel*, 107 U. S. 711; *Cunningham* v. *Macon & Brunswick Ry.*, 109 U. S. 446.

*Murray* v. *Wilson Distilling Co.*, 213 U. S. 150, is conclusive of the issue here. The State has placed the management of a state fund in the hands of a board of state officers; and, as in that case, the purpose of the fund is to pay certain claimants; the State has selected that board, and no other tribunal to determine what claims shall be paid. The courts have no jurisdiction.

The case is not one in which it is sought to move the officer through the State but on the contrary the State is sought to be moved through its officers. Of this, the court has no jurisdiction, as it is in violation of the Eleventh Amendment.

The action is for mandamus, not ancillary to a prior judgment. *Farmers Nat. Bank* v. *Jones*, 105 Fed. Rep. 459. Not being ancillary to any judgment previously obtained, the Federal District Court had no jurisdiction thereof. *Covington &c. Bridge Co.* v. *Hager*, 203 U. S. 109; *Knapp* v. *Lake Shore Ry.*, 197 U. S. 540; *Fuller* v. *Aylesworth*, 75 Fed. Rep. 694. See also *Jabine* v. *Oats*, 115 Fed. Rep. 861; *Wiemer* v. *Louisville Water Co.*, 130 Fed. Rep. 246; *Large* v. *Consul*, 137 Fed. Rep. 168; *Pensacola* v. *Lehman*, 57 Fed. Rep. 324; *Denton* v. *Barber*, 79 Fed. Rep. 189; *Burnham* v. *Fields*, 157 Fed. Rep. 248; *Gares* v. *Northwest Bldg. Assn.*, 55 Fed. Rep. 210; *Indiana* v. *Lake Erie &c. Ry.*, 85 Fed. Rep. 3.

This rule applies to district courts as well as circuit courts. *In re Forsyth*, 78 Fed. Rep. 301.

The petition sets forth no cause of action.

*Mr. Charles A. Loomis* and *Mr. Allen McReynolds*, with whom *Mr. Howard Gray* and *Mr. John W. Halliburton*, were on the brief, for appellee:

A proceeding to obtain a judgment against officials in a representative capacity, payable out of a specific fund in their charge and control, is a proceeding to obtain a judgment for money not otherwise secured, within the meaning of the Federal Judiciary Act and confers jurisdiction upon the United States court. And this is true although it may be necessary to resort to mandamus to enforce collection of the judgment when obtained. *Jordan* v. *Cass Co.*, 3 Dill. 185; *Cass Co.* v. *Johnston*, 95 U. S. 360; *Davenport* v. *Dodge Co.*, 105 U. S. 237; and see also *Aylesworth* v. *Gratiott*, 43 Fed. Rep. 340; *S. C.*, aff'd, 159 U. S. 40; *Fuller* v. *Aylesworth*, 75 Fed. Rep. 694; *Heidekoper* v. *Hadley*, 177 Fed. Rep. 1.

This is not a suit against the State. An action against a state officer to compel him to perform duties prescribed by law, is not an action against the State. An officer who refuses to obey the law does not stand for the State, within the meaning of the Federal Constitution.

A sovereign State must be presumed to be willing that its laws shall be obeyed. Through its laws it speaks to its servants, and commands them to do something. This suit therefore, instead of being against the State, is against its servants to compel the performance of duties, which by their acceptance of the office, they obligated themselves to perform. *Heidekoper* v. *Hadley*, 177 Fed. Rep. 1; *Lankford* v. *Oklahoma Engraving Co.*, 130 Pac. Rep. 278; *State* v. *Cockrell*, 27 Oklahoma, 630; *Ralston* v. *Missouri Fund*, 120 U. S. 390; *Graham* v. *Folsom*, 200 U. S. 248; *Taylor* v. *Louisville &c. R. Co.*, 88 Fed. Rep. 350; *Smith* v. *Ames*, 169 U. S. 518; *Ex Parte Young*, 209 U. S. 123.

The fact that the complainant may have a remedy in an original proceeding in mandamus in the state court for the cause of action alleged, will not deprive the complainant of the right to sue in equity in the Federal court. *Smith* v. *Ames*, 169 U. S. 518.

The Oklahoma depositors' guaranty fund is not a part

of the general state funds and is not under the control of, and cannot be used by, the executive or legislative branches of the state government for general state purposes, or for any purpose whatever. The fund is in the possession and control of the State Banking Board, and can be used solely for the purpose of paying depositors of failed banks. *Danby* v. *State Treasurer*, 39 Vermont, 92; Sess. Laws, Oklahoma, 1911, ch. 31, § 6; *Id.*, 1913, ch. 22, § 6.

Depositors in failed banks have a justiciable right to enforce payment out of the depositors' guaranty fund. *Danby* v. *State Treasurer*, 39 Vermont, 92.

This is not a suit on a certificate of deposit, as a negotiable instrument, but is a suit for money actually deposited. The fact that a certificate of deposit was accepted as evidence of the deposit, will not deprive the depositor of the right to be paid out of the depositors' guaranty fund.

The holder of a time certificate of deposit is a "depositor" within the meaning of the State Bank Guaranty Law of Oklahoma. Tiffany on Banks, 75; *Williams* v. *Rogers*, 77 Kentucky, 776; *Wilkes & Co.* v. *Arthur*, 74 S. E. Rep. 361; *Lamar* v. *Taylor*, 80 S. E. Rep. 1085.

The Federal courts have an independent jurisdiction in the administration of the state laws in cases between citizens of different States, coördinate with and not subordinate to that of the state courts and are bound to exercise their own judgment as to the meaning and effect of those laws.

As the object in giving the national courts jurisdiction to administer the laws of the States in controversies between citizens of different States, was to institute an independent tribunal which would not be supposed to be affected by local prejudice or sectional views it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication.

*Burgess* v. *Seligman,* 107 U. S. 20, 30; *Bucher* v. *Cheshire R. Co.,* 125 U. S. 555; *Julian* v. *Central Trust Co.,* 193 U. S. 93; *Stanley Co.* v. *Coler,* 190 U. S. 437; *Kuhn* v. *Fairmount Coal Co.,* 215 U. S. 349, 360; *Oats* v. *First National Bank,* 100 U. S. 239; *Pana* v. *Bowler,* 107 U. S. 529.

In respect to the doctrine of commercial law and general jurisprudence the courts of the United States will exercise their own independent judgment. In respect to such judgment they will not be controlled by decisions based upon local statutes or local usage, although if the question is balanced with doubt, the United States court, for the sake of harmony, "will lean to an agreement of views with the state courts." *Swift* v. *Tyson,* 16 Pet. 1, 19; *Presidio Co.* v. *Noel-Young Co.,* 212 U. S. 58; *Burgess* v. *Seligman,* 107 U. S. 20, 30.

When the law of a State has not been settled it is not only the right but the duty of the Federal court to exercise its own judgment in construing state statutes, as it also always does when the case before it depends on the doctrine of commercial law and general jurisprudence. *Kuhn* v. *Fairmount Coal Co.,* 215 U. S. 349, 360; *Swift* v. *Tyson,* 16 Pet. 1, 19.

This action is not an action against the State. The defendants cannot seek shelter behind the State for the abuse of their discretion in office. See § 55, Art. 5, Const. of Oklahoma, the purpose of which is to control the method in which public money or state funds should be disbursed. The word "appropriation" has a definite and certain meaning in law and is generally defined as the setting apart from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money and no more, for that object and no other. *State* v. *Moore,* 50 Nebraska, 88; *Ristine* v. *State,* 20 Indiana, 328; *Clayton* v. *Barry,* 27 Arkansas, 129; *Stratton* v. *Greene,* 45 California, 149; *State* v. *LaGrave,* 23 Nebraska, 25; *State*

v. *Wallichs*, 12 Nebraska, 407; *Proll* v. *Dun*, 80 California, 220.

As applied to the general fund in the treasury of a State, "appropriation" is defined to be an authority from the legislature, given at the proper time and in legal form to the proper officer, to supply sums of money, out of that which may be in the treasury in a given year, for specific objects or demands against the State. *State* v. *Lindsley*, 3 Washington, 125; *State* v. *King*, 67 S. W. Rep. 812; *Ristine* v. *State*, 20 Indiana, 328; *Shatteck* v. *Kincaid*, 31 Oregon, 379.

Nothing in *Noble State Bank* v. *Haskell*, 219 U. S. 104, warrants the conclusion that the guarantee fund is one of the State. See § 7919.

Administrative or ministerial officers with duties prescribed by law for their performance may be compelled to perform those duties by those who may be directly interested in their performance. *Board of Liquidation* v. *McComb*, 92 U. S. 531; *Rolston* v. *Missouri*, 120 U. S. 390; *Graham* v. *Folsom*, 200 U. S. 248; *Taylor* v. *Louis. & Nash. R. R.*, 88 Fed. Rep. 350; *Madison* v. *Smith*, 83 Indiana, 502; *Huidekoper* v. *Hadley*, 177 U. S. 1; *State Board* v. *People*, 191 Illinois, 528; *State* v. *Bourne*, 151 Mo. App. 104; *State* v. *Adcock*, 206 Missouri, 556.

The money in the guarantee fund is not subject to appropriation by the legislature for any purpose it may see fit. On the contrary it is collected from a special source for a limited purpose. The credit of the State is not loaned, simply the credit of this fund. *Ipso facto* it follows that this is not a suit against the State.

Under our system of laws there is no wrong without a remedy, and yet to deprive the appellee in this case of its money and deny it judicial relief with the barren statement that this action could not be maintained because against the State would certainly work a wrong, and no less certainly find appellee without a remedy.

Mr. Justice McKenna delivered the opinion of the
court.

Suit in equity brought by appellee against appellants,
constituting the Oklahoma State Banking Board. The
Platte Iron Works Company, appellee, is a Maine cor-
poration and a citizen of that State and became the holder
of two certain time certificates of deposit issued by the
Farmers' & Merchants' Bank of Sapulpa. Appellants
are members of the State Banking Board, and the appel-
lant J. D. Lankford is the State Bank Commissioner.

On September 10, 1912, the Bank Commissioner took
charge of the Farmers' & Merchants' Bank and of all its
assets and proceeded to wind up its affairs. Demand for
the payment of the certificates was made upon the Bank-
ing Board and the Commissioner out of the Depositors'
Guaranty Fund of the State, but payment was refused.

A decree was prayed adjudging appellee owner of the
deposits and certificates of deposit and that it was entitled
to have the same paid out of the Depositors' Guaranty
Fund created under and by virtue of the laws of the State.
If there should be not sufficient funds available therefor,
that the Banking Board be required to issue to appellee
certificates of indebtedness for the amount of the deposit,
to be known as "Depositors' Guaranty Fund Warrants
of the State of Oklahoma" bearing 6% interest as provided
by § 3, Article 2, Chapter 31, Session Laws of Oklahoma,
1911, as amended by Senate Bill No. 231, passed at the
last session of the State Legislature, and that the Banking
Board be required to levy an assessment against the cap-
ital stock of each and every bank and trust company or-
ganized and existing under the laws of Oklahoma for the
purpose of increasing such Depositors' Guaranty Fund
and pay the deposits and the "Depositors' Guaranty Fund
Warrants of the State of Oklahoma." General relief was
also prayed.

Defendants in the suit, appellants here, moved to dismiss the bill on the ground that the court had no jurisdiction of the action or of the persons of the defendants, the suit being one against the State of Oklahoma without its consent, in violation of the provisions of the Eleventh Amendment to the Constitution of the United States.

The motion was denied and defendants were given thirty days to answer. No answer appears in the record but the decree recites that one was filed. The court entered a decree as prayed for in the bill and this appeal was then prosecuted.

The assignments of error in this court are: (1) The suit is an original action in mandamus and the District Court had no jurisdiction, the same not being ancillary to any judgment theretofore obtained; (2) the suit is one against the State, "the defendants [appellants] having no personal interest therein and being sued in their official capacity as agents" of the State; (3) the amended bill upon its face states no cause of action for relief.

Is the suit one against the State? The appellee earnestly contends that the answer should be in the negative. "An action," counsel say, "against a State officer to compel him to perform duties prescribed by law is not an action against the State. An officer who refuses to obey the laws does not stand for the State, within the meaning of the Federal Constitution."

These contentions depend upon the meaning of the law; they assume its commands are disobeyed by the officers of the State; in other words, that the default of the officers is personal, in opposition—not in conformity—to the law of the State. But another and seemingly broader contention is made. It is asserted that the Depositors' Guaranty Fund is not under the executive and legislative control of the State and cannot be used by either for any purpose whatever, but "can be used solely for the purpose of paying depositors of failed banks." Two questions,

therefore, are presented, one of power and one of interpretation.

This court, in *Noble State Bank* v. *Haskell*, 219 U. S. 104, sustained the constitutionality of the act as an exercise of the police power of the State. The law in its general purpose was there presented and passed on. The relation of the State to the fund did not come up for consideration, but necessarily this is but a detail in administration not one affecting legality of the law. The creation of the fund was said to be justified by its purpose, and the power of the State was declared adequate to accomplish it. "The purpose of the fund," it was said, "is shown by its name. It is to secure the full repayment of deposits."

Where the State should vest the title to the fund for the purpose of its administration was immaterial to the essence of the power to create the fund. Whether the State should commit it to the mere ministerial administration of the Bank Commissioner and Banking Board and subject them to controversies with depositors or draw around them the circle of its immunity, was a matter within its competency to determine, and we are brought to the question of interpretation—which has the State done?

By the statute, the Banking Board is composed of the Bank Commissioner and three other persons, to be appointed by the Governor; and it is provided that the "Board shall have supervision and control of the Depositors' Guaranty Fund, and shall have power to adopt all necessary rules and regulations not inconsistent with law for the management and administration of said fund." The fund is created by levying "against the capital stock of each and every bank organized and existing under the laws" of the "State an annual assessment equal to one-fifth of one per cent., and no more, of its average daily deposits during its continuance as a banking corporation," the fund to be "used solely for the pur-

pose of liquidating deposits of failed banks and retiring warrants provided for" in the act. If at any time the fund be insufficient for such purpose or to pay "other indebtedness properly chargeable against the same, the Banking Board shall have authority to issue certificates of indebtedness to be known as 'Depositors' Guaranty Fund Warrants of the State of Oklahoma,' in order to liquidate the deposits" or such other indebtedness. It is provided that the depositors shall be paid in full, and when the cash available or that can be made immediately available is not sufficient to discharge the obligations of the bank or trust company "the Banking Board shall draw from the depositors' guaranty fund and from additional assessments, if required, as provided in § 300, the amount necessary to make up the deficiency; and the State shall have, for the benefit of the depositors' guaranty fund, a first lien upon the assets of said bank or trust company, and all liabilities against the stockholders, officers and directors of said bank or trust company and against all other persons, corporations or firms. Such liabilities may be enforced by the State for the benefit of the depositors' guaranty fund."

The contention of appellee is that the law has created a fund for the payment of depositors and directs that they shall be paid in full from the fund or "from additional assessments." If the fund be insufficient for such purpose, it is further contended, the Board is required to issue guaranty fund warrants in order to liquidate the deposits. Such, it is insisted, are the plain commands of the statute to which obedience is imposed and is necessary to fulfill the purpose of the law, which is to secure the full repayment to depositors. And, therefore, a suit by depositors is not a suit against the State but a suit to compel submission by the officers of the State to the laws of the State, accomplishing at once the policy of the law and its specific purpose.

There is strength in the contentions and we are not insensible to it, but there may be more complexity in fulfilling the scheme of the statute than the language of counsel exhibits and it may be embarrassed if not defeated by subjecting the Banking Board to incessant judicial inquiries of its administration. We certainly cannot assume that it will not do its duty and provide the ultimate payment of all depositors. To this result the State makes itself an active agent. It is given a lien upon the assets of insolvent banks and upon all liabilities against their stockholders, officers, directors, and against other persons, which may be enforced by the State for the benefit of the fund which its law has created.

In *Murray* v. *Wilson Distilling Co.*, 213 U. S. 151, there is analogy to the case at bar. The State of South Carolina in the year 1892 assumed the exclusive management of all traffic in liquor. It subsequently abandoned the scheme and passed an act called "the State Dispensary act" to provide for the disposition of all property of the instrumentality it had created and to wind up its affairs. A commission was appointed for that purpose. A part of the duties of the commission was to dispose of the property, collect all debts due and pay "from the proceeds thereof all just liabilities at the earliest date practicable." Any surplus was to be paid to the State Treasury. A duty, therefore, was imposed upon the commission to collect the assets of the dispensary and pay its debts and it was as directly expressed as was the duty imposed upon the Banking Board in the pending case.

The Wilson Distilling Company contended that the Winding-up Act of the State created a trust, and the funds in the hands of the commission were a trust fund held for the benefit of the creditors of the State dispensary and the suit a plain suit in equity brought by a *cestui que trust* to compel a trustee holding property for his benefit

to perform the duties imposed upon him. The suit, there-- fore, it was contended, was not to require the commis- sioners to do that which the law of the State forbade, but to do what the law of the State commanded, and the State was not a necessary nor an indispensable party. The contentions received the approval of the Circuit Court of Appeals, but this court took a different view of them and decided that there was "no just ground for the conclusion that the State, in providing by that legis- lation for the liquidation of the affairs of the State dis- pensary, intended to divest itself of its right of property in the assets of that governmental agency, and to endow the commissioners with a right and title to the property which placed it so beyond the control of the State as to authorize a judicial tribunal to take the assets of the State out of the hands of those selected to manage the same, and by means of a receiver to administer such as- sets as property affected by a trust, irrevocable in its nature, and thus to dispose of the same without the pres- ence of the State." (213 U. S., p. 170.) The case, it is true, has some differences from that at bar. There the State was the owner of the property committed to the commissioners for disposition and was also the original debtor. Here the property is that of the contributing banks and is accumulated in a fund for the security of their respective depositors. These are differences, but there are substantial resemblances. In that case officers were appointed to administer the property and liquidate and pay the demands against it, and this was the specific direction of the law, marking the beneficiaries and ap- parently making them the exclusive parties in any pro- ceedings to enforce the law. In this case officers are ap- pointed having even a greater power. They are not only empowered to liquidate the deposits or other indebted- ness of failed banks, but to levy assessments on other banks to make up any deficiency. Therefore, as the

State was said to be a necessary party in the cited case, the State can, be said to be a necessary party in the pending case because of its interest that the fund which it has caused to be created in pursuance of its policy shall be administered by the officers it has appointed rather than by judicial tribunals. Certainly this construction can be given to the Oklahoma statute; and, granting that it may admit of dispute, an important element to be considered is the decision of the state tribunals.

In *State* v. *Cockrell*, 112 Pac. Rep. 1000, the Supreme Court of Oklahoma had occasion to define the duties of State Examiner and Inspector. It decided that the office was constituted by the constitution of the State and was independent of the control of the Governor, and passing upon the authority of the Examiner and Inspector over the accounts of the Bank Commissioner it decided that "the funds and assets" of an insolvent bank are "under the management of the State" and "that the depositors' guaranty fund and the funds of a failed bank in the hands of a Bank Commissioner for the purpose of reimbursing the depositors' guaranty fund is as much a fund of the State as the common school fund."

It was further decided that the act creating the fund was sustained as an exercise of the police power for the public welfare of the people of the State and, having been so exercised, the assessment levied by it upon deposits for the purpose of protecting the depositors of the banks is the exertion of the same power "which levies or causes to be levied, a tax upon the property within the State for the maintenance and support of the common schools and educational institutions." And it was said, "The title of such depositors' guaranty fund vests in the State just as much so as the common school lands or the proceeds of the sale of the same, and the taxes levied and collected for the maintenance and support of said schools, all of which are held in trust by the State for

a specific purpose. Even if it were not a state fund, it would at least be a fund under the management of the State."

From this decision it appears that the law intended to give to the State as definite a title to the Depositors' Guaranty Fund as to the common school fund, as definite, therefore, as the title of South Carolina to the assets of the State dispensary, which was the subject of decision in *Murray* v. *Wilson Distilling Company.* In both cases there were ultimate beneficiaries—in the pending case, the bank depositors; in the other case, the creditors of the dispensary. And the purpose of the law—or, if you will, the command of the law—in each case was or is the satisfaction of the claims of those beneficiaries. The fund having this ultimate destination does not take its administration from the officers of the State or subject them to judicial control. We cannot assume that it will not be faithfully managed and applied.

In *Lovett et al., County Commissioners of Creek County,* v. *Lankford et al.,* composing the Banking Board of the State of Oklahoma, 145 Pac. Rep. 767, the Supreme Court of Oklahoma decided, citing the *Cockrell Case,* that the defendants in error in the case composing the Banking Board were "executive officers of the State, and in performing their duties in administering the law under consideration (the Guaranty Fund Act), do so as such officers, and the property entrusted to their control and management by the law is property owned by the State, or property in which the State has an interest," and that therefore a suit against them to compel their administration of the depositors' guaranty fund "is, in fact, a suit against the State; and in the absence of the consent of the State, the same cannot be maintained." The court further said that "the law has specifically confided to the Banking Board and the Bank Commissioner the duty and authority to determine the validity of claims against the depositors'

guaranty fund," and, also that "it is not only their duty to determine when a claim is valid against the bank, but they must further determine whether such claim is protected and required to be paid from the depositors' guaranty fund. *Lankford* v. *Oklahoma Engraving and Printing Co.*, 35 Oklahoma, 404." Any other view, the court in effect said, would not only substitute the judgment of a court for that of the officials, "but would harass and create confusion, the effect of which would destroy the efficiency of such board." That case and *Columbia Bank and Trust Company* v. *United States Fidelity and Guaranty Company*, 33 Oklahoma, 535, give special emphasis to the principle announced. Both were suits to recover deposits respectively of county and state moneys deposited as general or special deposits.

It will serve no purpose to review the cases cited by appellee in which state officers were enjoined from doing unlawful acts, prescribed, it may be, by unconstitutional laws, or commanded by valid laws to perform specific duties. Examples of such cases are reviewed and distinguished in *Murray* v. *Wilson*, and there is a later example in *Hopkins* v. *Clemson College*, 221 U. S. 636.

The foundation of appellees' argument is, as we have said, that the Oklahoma statute imposed the duty upon the Bank Commissioner of paying depositors of insolvent banks and that "this suit, therefore, instead of being against the State, is against its servants to compel the performance of duties, which, by their acceptance of the office, they obligated themselves to perform." A duty being prescribed, it is further contended, the officers "cannot seek shelter behind the State for the abuse of their discretion in office." But these contentions and the arguments based upon them all depend upon an incorrect version of the statute, as we have seen.

*Decree reversed.*

MR. JUSTICE PITNEY, with whom concurred MR. JUS-
TICE DAY, MR. JUSTICE VAN DEVANTER and MR. JUSTICE
LAMAR, dissenting.

The question upon which we are divided is whether
this action, brought by a depositor in an insolvent state
bank of Oklahoma, asserting the right to compel payment
of his deposit by the State Banking Board out of the
Depositors' Guaranty Fund, or, if this be insufficient,
then by the issuance of a certificate of indebtedness of
the kind known as Depositors' Guaranty Fund Warrants,
is in effect a suit against the State, and therefore within
the inhibition of the Eleventh Amendment to the Federal
Constitution, or whether it is merely an action against
state officers to compel the performance of duties of a
non-political nature clearly prescribed by a statute of the
State, so that the officers in refusing to obey that law do
not represent the State. I agree that the question depends
upon the true intent and meaning of the law, and that in
determining it we are to assume that the commands of
the law are disobeyed by the defendants-appellants; so
much, indeed, having been adjudged, upon their con-
fession, in the present case.

There is, I think, no controlling decision.

*Murray* v. *Wilson Distilling Co.,* 213 U. S. 151, seems
plainly distinguishable. That case dealt with transactions
in which the State of South Carolina had a direct property
interest and a direct responsibility as a contracting party;
and it was upon this ground that the court held the action
brought against the agents of the State was in effect a
suit against the State. This will appear by a reference
to the opinion, pp. 168, 170, etc. It will be my endeavor
to show that, under the Oklahoma statute, there is no
such interest or responsibility on the part of the State.

We are referred to certain cases in the state court of
last resort, one of which, and a very recent one, bears

directly upon the question; and it is frankly conceded that proper deference should be paid to them.  At the same time, it is not to be forgotten that this action was brought in the District Court of the United States because of the diverse citizenship of the parties,—a ground of jurisdiction especially provided for in the Constitution (Art. III, § 2).  And, however desirable it may be to preserve harmony of decision between the Federal and the state courts, we cannot, with due regard to our duty, fail to exercise an independent judgment respecting the true intent and meaning of the statute, in the absence of an authoritative adjudication to the contrary *previous to the time that the cause of action arose.*  For this plaintiff-appellee is entitled to the enforcement of its contract as it was made; and it invokes a Federal jurisdiction that was established for the very purpose of avoiding the influence of local opinion.  *Burgess* v. *Seligman*, 107 U. S. 20, 33, 34; *East Alabama Ry.* v. *Doe*, 114 U. S. 340, 353; *Gibson* v. *Lyon*, 115 U. S. 439, 446; *Anderson* v. *Santa Anna*, 116 U. S. 356, 362; *B. & O. Railroad* v. *Baugh*, 149 U. S. 368, 372; *Folsom* v. *Ninety-six*, 159 U. S. 611, 625; *Stanly County* v. *Coler*, 190 U. S. 437, 444; *Kuhn* v. *Fairmont·Coal Co.*, 215 U. S. 349, 357, 360.

The statute in question is the so-called·Bank Depositors' Guaranty Fund Act of Oklahoma, first enacted December 17, 1907, and several times amended, but not in essential respects.  The portions pertinent to the discussion, as they stood upon the statute-book when the present cause of action arose (in the year 1912) are set forth in the margin, followed by an amendment adopted in 1913, shortly before the action was commenced.[1]

---

[1] Extracts from Bank Depositors' Guaranty Fund Act, as found in Revised Laws of Oklahoma, 1910 (Harris and Day), §§ 298, *et seq.*, and in subsequent Session Laws.

Section 3 (299 and 300, as amended by Laws 1911, p. 54), "There is hereby levied an assessment against the capital stock of each and every

It seems to me clear that, by the language and evident meaning of this law, the State has no property interest in the guaranty fund.　No part of it is raised through general taxation, nor can any part of it be lawfully placed in the treasury of the State, or devoted to any of the

---

bank and trust company organized or existing under the laws of this State, for the purpose of creating a Depositors' Guaranty Fund, equal to 5 per centum of its average daily deposits during its continuance in business as a banking corporation.　Said assessment shall be payable one-fifth during the first year of existence of said bank or trust company, and one-twentieth during each year thereafter until the total amount of said 5 per centum assessment shall have been fully paid. . . . After the 5 per centum assessment, hereby levied, shall have been fully paid, no additional assessment shall be levied or collected against the capital stock of any bank or trust company, except emergency assessments, hereinafter provided for, to pay the depositors of failed banks, and except assessments that may be necessary by reason of increased deposits to maintain such funds at 5 per centum of the aggregate of all deposits in such banks and trust companies, doing business under the laws of this State. . . .

"Whenever the depositors' fund shall become impaired or be reduced below said 5 per centum by reason of payments to depositors of failed banks, the State Banking Board shall have the power and it shall be its duty to levy emergency assessments against capital stock of each bank and trust company doing business in this State to restore said impairment or reduction, but the aggregate of such emergency assessments shall not, in any one calendar year, exceed 2 per centum of the average daily deposits of all such banks and trust companies.　If the amount realized from such emergency assessments shall be insufficient to pay off the depositors of all failed banks having valid claims against said Depositors' Guaranty Fund, the State Banking Board shall issue and deliver to each depositor, having such unpaid deposit, a certificate of indebtedness for his unpaid deposit, bearing 6 per centum interest. Such certificate shall be consecutively numbered, and shall be payable, upon the call of the State Banking Board, in like manner as state warrants are paid by the state treasurer in the order of their issue, out of the emergency levy thereafter made; and the State Banking Board shall from year to year levy emergency assessments, as hereinbefore provided, against the capital stock of all the banking corporations and trust companies doing business in this State, until such certificates of indebted-

ordinary purposes of the government, or to any purpose
other than the. payment of depositors.   The State, it is
true, through the Banking Commissioner, holds the bare
legal title to the fund, and enforces in the name of the

---

ness, with the accrued interest thereon, shall have been fully. paid.  As
rapidly as the assets of failed banks are liquidated and realized upon
by the bank commissioner, the same shall be applied first, after the
payment of the expenses of liquidation, to the repayment of the De-
positors' Guaranty Fund of all money paid out of said fund to the
depositors of such failed bank, and shall be applied by the State Bank-
ing Board toward refunding any emergency assessment levied by reason
of the failure of such liquidated bank.   Provided, that the guaranty
fund collected under this act, shall be re-deposited with the banks from
which it was paid and a special certificate, or certificates, of deposit
shall be issued to the bank commissioner by each and every bank and
trust company, bearing 4 per centum interest per annum."

By § 5 (302) in the event of the insolvency of any bank, the bank
commissioner "may, after due examination of its affairs, take possession
of said bank or trust company and its assets, and proceed to wind up
its affairs and enforce the personal liability of the stockholders, officers
and directors."

Section 6 (303) "In the event that the bank commissioner shall take
possession of any bank or trust company which is subject to the pro-
visions of this chapter, the depositors of said bank or trust company
shall be paid in full, and when the cash available or that can be made
immediately available of said bank or trust company is not sufficient to
discharge its obligations to depositors, the said banking board shall
draw from the depositors' guaranty fund and from additional assess-
ments, if required, as provided in section 300, the amount necessary
to make up the deficiency; and the State shall have, for the benefit of
the depositors' guaranty fund, a first lien upon the assets of said bank
or trust company, and all liabilities against the stockholders, officers
and directors of said bank or trust company and against all other per-
sons, corporations or firms.   Such liabilities may be enforced by the
State for the benefit of the depositors' guaranty fund."

Section 8 (305) "The bank commissioner shall deliver to each bank
or trust company that has complied with the provisions of this chapter
a certificate stating that said bank or trust company has complied with
the laws of this State for the protection of bank depositors,' and that
safety to its depositors is guaranteed by the depositors' guaranty fund
of the State of Oklahoma.   Such certificate shall be conspicuously dis-

LANKFORD v. PLATTE IRON WORKS.    481

235 U. S.   Pitney, Day, Van Devanter, Lamar, JJ., dissenting.

State the liabilities of the failed banks, but this is done for the sole benefit of the fund.   Thus the State has title only, but without real ownership.   Not even is the credit of the State pledged for the success of the scheme, for while § 8 permits banks to display an official certificate of compliance with the law, the certificate declares that safety to the depositors is guaranteed not by the State but by the depositors' guaranty fund, and it is made a misdemeanor for any bank officer to advertise the deposits as guaranteed by the State.   It would, I think, be difficult to find language more clearly showing that the State is

---

played in its place of business, and said bank or trust company may print or engrave upon its stationery and advertising matter words to the effect that its depositors are protected by the depositors' guaranty fund of the State of Oklahoma: Provided, however, that no bank shall be permitted to advertise its deposits as guaranteed by the State of Oklahoma; and any bank or bank officers or employés who shall advertise their deposits as guaranteed by the State of Oklahoma shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not exceeding five hundred dollars or by imprisonment in the county jail for thirty days or by both such fine and imprisonment."

By act of March 6, 1913 (Sess. Laws, ch. 22, pp. 27–29), the third section was amended so as to provide for the issuance of certificates of indebtedness to be known as "Depositor's Guaranty Fund Warrants of the State of Oklahoma" in order to liquidate the deposits of failed banks or other indebtedness properly chargeable against the fund; the warrants to bear six per cent. interest, and to constitute a charge and first lien upon the depositors' guaranty fund when collected, as well as a first lien against the capital stock, surplus, and undivided profits of every bank operating under the banking laws of the State to the extent of its liability to the fund; and that "All warrants heretofore issued by the Banking Board shall be paid serially in the order of their issuance from any funds on hand when this act takes effect or provided for by the terms of this act, and all warrants hereafter issued shall be in numerical order and retired in like order.   As rapidly as the assets of failed banks are liquidated and realized upon by the Bank Commissioner, the proceeds thereof, after deducting the expenses of liquidation, shall be paid to the State Banking Board, and by said board credited to the Depositors' Guaranty Fund."

neither interested in the fund nor responsible to the depositors with respect to it. And when we read these and the other provisions of the act in the light of the state constitution, the matter becomes still more plain. For, by the constitution, Article 5, § 55, "No money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, . . . and every such law . . . shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum." It cannot, I think, be reasonably contended that the guaranty fund was intended to be a state fund, or a fund under the management of the State, within the meaning of the constitution. To so hold would render the Act violative of the section quoted, since its provisions are plainly inconsistent with the slow and formal process of legislative appropriations. Again, by Article 10, § 15, of the state constitution, "The credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association . . .; nor shall the State become an owner or stockholder in, nor make donation by gift, subscription to stock, by tax or otherwise, to any company, association, or corporation." These constitutional limitations explain, I think, why in the framing of the Act the legislature was so careful to dissociate the State in its organized capacity from all participation in the scheme or responsibility for its success. The Act contemplates that the cash constituting the fund is to be in the physical custody of the banks themselves, until actually needed; for by § 3, as amended in 1911, it was provided that the fund should be redeposited with the banks from which it was paid, and a special certificate or certificates of deposit issued to the bank commissioner by each bank, bearing four per centum interest per annum; and by the 1913 amendment the

annual assessments for that and succeeding years are to be paid by cashier's checks, to be held by the Banking Board until in its judgment it is necessary to collect them, but the checks are not to bear interest during the time they are so held. In short, the Act, as I read it, simply establishes a plan for enforced coöperative insurance by all the banks in favor of the depositors of each and every bank, the Bank Commissioner and the Banking Board being charged with the management of it as public trustees, with duties owing to a limited class of persons having financial and not political interests.

The promise held out to bank depositors is clear and unequivocal. By §§ 5 and 6, in the event of the insolvency of any bank, the bank commissioner may take possession of its assets, and in this event *"the depositors of said bank or trust company shall be paid in full,* and when the cash available or that can be made *immediately available* of said bank or trust company is not sufficient to discharge its obligations to depositors, the said banking board shall draw from the depositors' guaranty fund and from additional assessments, if required, as provided in section 300, the amount necessary to make up the deficiency." And by § 3 (300), if the amount realized from emergency assessments shall be insufficient to pay off the depositors, "The state banking board *shall issue and deliver to each depositor, having such unpaid deposit, a certificate of indebtedness for his unpaid deposit, bearing 6 per centum interest;"* these certificates to be consecutively numbered *and to be paid in the order of their issue* out of future emergency assessments which the Banking Board is required to levy annually until the certificates of indebtedness with accrued interest shall have been fully paid. By the 1913 amendment, the certificates of indebtedness are designated as "Depositors' Guaranty Fund Warrants," and are to constitute a charge upon the guaranty fund when collected as well as a lien against the capital stock, surplus, and

undivided profits of every bank to the extent of its liability to the fund.

The entire scheme is carefully devised to give assurance to every bank and to every bank depositor not merely of ultimate payment of the amount of the deposits, but of immediate payment in cash or in certificates salable for cash, in case the bank becomes insolvent. A winding up of the bank's affairs, with a liquidation of its assets and enforcement of the liabilities of stockholders, officers and directors, is provided for, and the proceeds are to be devoted to restoring the guaranty fund and repaying to the solvent banks the amount of the emergency assessments; but the depositors are not to await the outcome of the process. A main purpose of the Act, as I read it, is to relieve them not merely from the hazard of ultimate loss, but from the hardships normally incident to the delays of winding-up proceedings, and for which, as everybody knows, an ultimate allowance of interest is very often an inadequate compensation.

The law was intended, as I think, to render the rights of depositors so clear as to be readily understood by all, and free from cavil or question in any quarter. It constitutes a clear and unequivocal tender of a benefit to every person who might contemplate becoming a depositor of a state bank in Oklahoma. Under § 8 every bank is permitted to advertise that its depositors are protected by the Depositors' Guaranty Fund. Every would-be depositor is thus directly referred to the terms of the law, and on reading it may learn that in the event of insolvency "the depositors of said bank or trust company shall be paid in full," etc.

It was said upon the argument that this promise, however unequivocal, is a "political" promise, and therefore not enforceable by suit. If it is a promise of the State of Oklahoma it of course is a "political" promise; otherwise not. But does not § 8 show most plainly that it is not

at all a promise of the State, and is enforceable out of and only out of a fund kept upon deposit in the banks themselves and controlled by trustees whose salaries are, indeed, paid from the public treasury, but who are charged with no political function, and whose duties are owing solely to the banks and to depositors and others interested in the banks?

The failure of the statute to make any express provision for an action against the Banking Board at the suit of a depositor can hardly be deemed significant. This is taken care of in the Constitution, which declares (Art. 2, § 6): "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation."

That the fund is established for a public purpose through the exercise of the police power of the State does not, I submit, make the fund itself public property. It is closely analogous, I think, to the surplus of a mutual insurance company. The argument that the fund is public will hardly bear analysis. In one of the briefs it is expressed as follows: "The essence of the law, therefore, is not to establish a private right, but to serve public welfare; and as such no justiciable rights in the depositors are presumed to arise; the law was not primarily enacted to return to the depositor his money, but more properly to prevent the public injury by bank panics. Nowhere is there language used showing an intent to give to a depositor the right to sue." But, since bank panics are caused by the fear on the part of depositors that their money—that is, their ability to withdraw the money or otherwise realize upon their deposits—is in jeopardy, the argument pretty clearly defeats itself.

Not only has the State no part in the raising of the guaranty fund nor property in it, nor interest or responsibility in the distribution of it, nor even the remotest

PITNEY, DAY, VAN DEVANTER, LAMAR, JJ., dissenting.    235 U. S.

reversionary right should the scheme prove a failure, but the Act contains no expression of a purpose that the public trustees are to be clothed with that immunity from private suit which is one of the prerogatives of sovereignty. There is nothing to suggest any participation by the State in the transaction, except that § 6 declares that "The State shall have for the benefit of the Depositors' Guaranty Fund a first lien upon the assets of said bank," etc., and that "such liabilities may be enforced by the State for the benefit of the Depositors' Guaranty Fund." But does not this plainly show that the State is to be a merely nominal party, and that the fund alone is the real beneficiary? It seems to me the language naturally imports the familiar action brought in the name of one but for the sole use of another; an action in which the nominal plaintiff at the same time avows that he has no interest in the proceeds. I cannot find in § 6, or elsewhere, anything to suggest that the State is to be an active agent in the matter, otherwise than as the Bank Commissioner and Banking Board act therein.

It is argued that the Board is endowed with discretionary powers in respect to the administration of the fund. I concede that the Act implies a considerable latitude of administrative discretion with respect to the care and management of the fund; but it is quite different with the provision for the payment of depositors. Here the plain mandate is: "Pay in cash, so far as you have it, and give certificates of indebtedness or warrants to the extent that the cash falls short." The argument in behalf of appellants goes to the length of saying: "It (the fund) may be used not only to pay the depositors of failed banks, but frequently to aid banks while in a failing condition. All of the fund which may be available at a particular time might, in the judgment of the Banking Board, be better used to aid disabled banks than to be

applied to the immediate payment of depositors of a particular bank which had already been taken into the custody of the Bank Commissioner. In this way the available funds might be withdrawn by the Banking Board, in the exercise of its discretion, from the payment of a failed bank," etc. As showing the results to which the argument for discretionary powers with respect to paying depositors logically leads, this is illuminating; but if anything is clear in the letter and spirit of this enactment, it is that the legislature by no means intended that the fund or any part of it should be subject to use in supporting banks while in a failing condition, or in any other form of hazardous enterprise.

And it would seem plain enough that an interest on the part of the State or a discretion on the part of the Banking Board ought not to be read into the Act by construction, when the result is, not to make the promised guaranty more clear or more readily enforceable by the depositors, but, on the contrary, to render it unenforceable except with the consent of the State, and therefore materially less valuable to the depositors than otherwise it would be.

It is submitted that for the proper interpretation of the statute—or, for its construction if construction be needed —we should observe the fundamental rules that apply to contracts; for while there is disagreement upon the question whether the State is a party to it, we all agree that the Act prescribes a contract, and one of wide importance, between the banks and the depositors, and that the public interest is as much concerned in seeing it carried out and enforced according to its true intent and meaning as in requiring that the contract be made. Not only has the State obliged the banks to make this contract with their depositors, but in the law it has expressed the terms in which it shall be made. The courts, therefore, ought by all means to adopt an interpretation such as reasonably

would have been placed and presumably was placed upon the statute by ordinary bankers and bank depositors in advance of judicial interpretation; reading it according to the fair import of its terms, without resort to legal subtlety in order to overthrow or weaken it, but seeking rather to uphold it and give it effect, "*Ut res magis valeat quam pereat*"; and if construction be needed, adopting that meaning which the promisor had reason to believe the promisee relied upon in accepting the offer. 2 Kent Com. * 557; *The Binghamton Bridge*, 3 Wall. 51, 74; *Ewing* v. *Howard*, 7 Wall. 499, 506; *Empire Rubber Mfg. Co.* v. *Morris*, 73 N. J. Law, 602, 610; *Gunnison* v. *Bancroft*, 11 Vermont, 490; *Jordon* v. *Dyer*, 34 Vermont, 104, 80 Am. Dec. 668; *Barlow* v. *Scott*, 24 N. Y. 40, 42; *Tallcot* v. *Arnold*, 61 N. Y. 616; *White* v. *Hoyt*, 73 N. Y. 505; *Chamberlain* v. *Painesville & Hudson R. R.*, 15 Oh. St. 225, 246; *County of Clinton* v. *Ramsey*, 20 Ill. App. 577, 579.

I cannot resist the conviction that this legislation was intended to convey and did convey to the banks and to intending depositors the understanding that the deposits were to be secured by the Fund and not by the State, that in the event of the insolvency of any bank its depositors were to be paid in full, without delay and without "ifs" or "ans," out of the cash in the Fund, or at worst by delivery of interest-bearing certificates of indebtedness capable of being sold for cash and payable in consecutive order as issued, and that the duty imposed upon the Banking Board to thus pay off the depositors without regard to the ultimate outcome of the liquidation of the particular bank would be enforceable, if need be, by process out of the courts of justice. It savors of repudiation to read into the scheme an unexpressed condition that renders the promise unenforceable by any means within the command of the promisee.

Let us now examine the state decisions in their order.

*State ex rel. Taylor* v. *Cockrell* (1910), 27 Oklahoma, 630; 112 Pac. Rep. 1000. This was an action for a writ of mandamus instituted upon the relation of the "State Examiner and Inspector" (a constitutional officer with large powers, in the performance of which he is independent of the Chief Executive), to require the state bank commissioner to permit relator to examine the records and accounts pertaining to the collection and disbursement of the depositors' guaranty fund and the assets of failed or insolvent banks. Relator invoked a statute which declared: "The Examiner and Inspector shall examine the books and accounts of state officers whose duty it is to collect or disburse funds of the State, or (under) its management at least once each year." As the court said (27 Oklahoma, 632), the sole question involved was whether relator was authorized under the law to examine these records. The court's response was succinctly expressed,—"That the Bank Commissioner is a state officer has not been and cannot be questioned. That the depositors' guaranty fund, and the funds of a failed bank in the hands of a Bank Commissioner for the purpose of reimbursing the depositors' guaranty fund, is as much a fund of the State as the common school fund is also true. . . . The title of such depositors' guaranty fund vests in the State just as much so as the common school lands, or the proceeds of the sale of the same, and the taxes levied and collected for the maintenance and support of said schools, all of which are held in trust by the State for a specific purpose. Even if it were not a state fund, it would at least be a fund under the management of the State." I cannot see that this amounts to the placing of a construction upon the statute in any respect pertinent to the question now before us. The decision was in effect that the depositors' guaranty fund was under the management of the State through the bank commissioner, a state officer, and that, therefore,

the accounts of the latter were subject to examination by the Examiner and Inspector by the terms of the statute that defined his duties. Treating it as a decision that the *title* of the fund is in the State, within the meaning of that statute, this is very far from holding that the *real ownership* of the fund is in the State, so as to clothe the managers of the fund with immunity from suit in a controversy raised by one of the stated beneficiaries. The decision rather puts the Bank Commissioner in a subordinate position than in one that entitles him to participate in the sovereign's immunity from responsibility to action in the courts of justice.

*Columbia Bank & Trust Co.* v. *United States Fidelity & Guaranty Co.* (1912), 33 Oklahoma, 535; 126 Pac. Rep. 556. The bank commissioner applied to a state court for orders in connection with the administration of the affairs of an insolvent bank of which he was in possession, and prayed that the creditors and depositors be granted all relief to which they might be entitled. The Fidelity & Guaranty Company filed its petition in intervention, alleging that it had signed, as surety for the bank, a bond to the State of Oklahoma for the sum of $50,000 to protect the State against loss by reason of a deposit in the bank of certain funds in possession of the commissioners of the land office; and that the bank commissioner since taking charge of the assets of the bank had acted under the direction and control of the State Banking Board, and had paid the claims of other depositors in full without in any way protecting the deposit for which the intervening petitioner was surety. The trial court rendered a decree directing the bank commissioner to treat the amount due the commissioners of the land office as a deposit and pay over to said depositors their *pro rata* share of the assets. The Supreme Court, upon a review of other legislation (Comp. Laws, 1909, § 7943) relating to the custody and investment of the permanent school

LANKFORD v. PLATTE IRON WORKS.    491

235 U. S.   PITNEY, DAY, VAN DEVANTER, LAMAR, JJ., dissenting.

funds of the State in the hands of the commissioners of the land office, which provided (*inter alia*) that they might be deposited in bank upon security being given, held that such a deposit of the State's money was not within the purview of § 3 of the Guaranty Fund Law, and hence that the surety was not entitled to relief. In the course of reaching this conclusion the court held (p. 540) that the surety, having responded to the invitation implied in relator's prayer for relief in behalf of creditors and depositors, was entitled to "maintain its petition of intervention, and have its rights, if it has any, in relation to the bank guaranty fund, determined without having previously paid the penalty of its bond." There was no intimation that the Bank Commissioner was clothed with immunity from action, or endowed with any discretion that rendered it inappropriate that he should be sued.

*Lankford, Com'r, v. Oklahoma Eng. & Ptg. Co.* (1913), 35 Oklahoma, 404; 130 Pac. Rep. 278. The court simply held that a "merchandise creditor" of a defunct bank was not entitled to share *pro rata* with the depositors in the distribution of the assets.

It will be observed that both of the two latter cases were decided upon the merits of the intervenor's claims; upon grounds inconsistent, indeed, with the immunity from suit that is now asserted.

The last-mentioned decision was subsequent to the time when the rights of the present plaintiff accrued; the cases in 27 and 33 Oklahoma were decided before that time.

Another case, decided not only after the cause of action accrued but *after this court acquired jurisdiction* by the taking of the appeal, is *Lovett et al., Commissioners, v. Lankford* (September 29, 1914, 145 Pac. Rep. 767). Here the Supreme Court of Oklahoma has distinctly held that a petition for mandamus brought by a depositor against the State Banking Board to require payment of the de-

posit is in effect a suit against the State, and that the Board is a part of the executive branch of the government charged with the exercise of judgment and discretion in the administration of the law, so that their acts cannot be controlled by mandamus. This, of course, is directly in favor of the contention of the present appellants. Ought it to control our decision? What are the grounds upon which the state court proceeded? (a) Citing the language of the Act that gives to the State a first lien upon the assets of the Bank, and invoking the authority of *State ex rel. Taylor* v. *Cockrell,* 27 Oklahoma, 630, 633 (*supra*), the court holds that a judgment in favor of the depositor "would directly affect the State, and would, in effect, be a judgment against the State, and would require the subjection of state funds to satisfy said judgment." This treats the word "title" as equivalent to "ownership." I have endeavored to show that this is inconsistent with the language and purpose of the Act, and that state ownership renders the Act, in its other and essential provisions, inconsistent with the limitations found in the state constitution. (b) The court cites *Murray* v. *Wilson Distilling Co.,* 213 U. S. 151. For reasons already indicated, it seems to me this case is clearly distinguishable. (c) It is said that the failure of the legislature to make specific provision for review in the courts of the action of the Banking Board concerning claims against the guaranty fund tends to prove a legislative purpose to give exclusive jurisdiction to the Board. As already shown, it would be a work of supererogation for the legislature to specifically provide for an action in the courts; for, if the statute confers a right upon the depositor, art. 2, § 6 of the state constitution provides a remedy. And I find nothing in the Act that expressly or by reasonable implication confers any judicial jurisdiction upon the Board. Exclusive jurisdiction in that body seems plainly inconsistent with the same constitu-

LANKFORD v. PLATTE IRON WORKS.    493

235 U. S.    PITNEY, DAY, VAN DEVANTER, LAMAR, JJ., dissenting.

tional provision.   (d) After quoting from the 1st section of the Act, which gives to the banking board supervision and control of the fund, with power to adopt necessary rules and regulations, not inconsistent with law, for its management and administration, and after quoting the other pertinent sections that are set forth in the marginal note, *supra*, the court cites *Lankford* v. *Oklahoma Engraving & Printing Co.*, 35 Oklahoma, 404, *supra*, as authority for holding that under § 6 (303) it is the duty of the Banking Board and the Bank Commissioner to determine the validity of claims against the fund, and that: "By this section, it is not only their duty to determine when a claim is valid against the bank, but they must further determine whether such claim is protected and required to be paid from the depositors' guaranty fund." I am unable to find any provision of this kind in the statute; and the case cited, far from holding that these questions are confided to the decision of the Board or the Commissioner, is directly to the point that such questions are properly to be decided by the courts; and to the same effect is the case from 33 Oklahoma, cited above.

For these reasons, it is submitted that the decision just referred to ought not to be followed by this court in the present case.   Laying that on one side, and adopting that view of the statute above indicated as being in accord with its letter and spirit, there appears to be no legal or constitutional obstacle in the way of affirming the present decree.

For, if the action is not nominally or in effect a suit against the State, is not brought to enforce any liability or duty of the State or interfere with its property, but has for its object merely to require public officers to perform a plain official duty, not of a political nature, owing to a special class of persons among whom the plaintiff is included, it is not properly to be deemed a suit against the State within the prohibition of the Eleventh Amend-

ment. We are referred by appellant's counsel to *Louisiana* v. *Jumel*, 107 U. S. 711; *Cunningham* v. *Macon & Brunswick R. R.*, 109 U. S. 446; *Hagood* v. *Southern*, 117 U. S. 52; *In re Ayers*, 123 U. S. 443; *N. Y. Guaranty Co.* v. *Steele*, 134 U. S. 230; *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 10; *Smith* v. *Reeves*, 178 U. S. 436; and similar cases. But there is a broad distinction, uniformly recognized by this court, which, as it seems to me, takes the present action out of the prohibition of the Eleventh Amendment. It was well expressed in *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541, where the court, by Mr. Justice Bradley, said: "The objections to proceeding against state officers by mandamus or injunction are: first, that it is, in effect, proceeding against the State itself; and, secondly, that it interferes with the official discretion vested in the officers. It is conceded that neither of these things can be done. A State, without its consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled, that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it." In the *Jumel Case*, 107 U. S. at p. 727, Mr. Chief Justice Waite said: "The relators do not occupy the position of creditors of the State demanding payment from an executive officer charged with the ministerial duty of taking the money from the public treasury and handing it over to them, and, on his refusal, seeking to compel him to perform that specific duty." In the *Cunningham Case*, 109 U. S. at p. 452, Mr. Justice Miller, in describing

the class of cases in which public officers may be sued, said: "A third class, which has given rise to more controversy, is where the law has imposed upon an officer of the government a well defined duty in regard to a specific matter, not affecting the general powers or functions of the government, but in the performance of which one or more individuals have a distinct interest capable of enforcement by judicial process." In *Rolston* v. *Missouri Fund Commrs.*, 120 U. S. 390, 411, Mr. Chief Justice Waite said: "It is next contended that this suit cannot be maintained because it is in its effect a suit against the State, which is prohibited by the Eleventh Amendment of the Constitution of the United States, and *Louisiana* v. *Jumel*, 107 U. S. 711, is cited in support of this position. But this case is entirely different from that. There the effort was to compel a state officer to do what a statute prohibited him from doing. Here the suit is to get a state officer to do what a statute requires of him. The litigation is with the officer, not the State. The law makes it his duty to assign the liens in question to the trustees when they make a certain payment. The trustees claim they have made this payment. The officer says they have not, and there is no controversy about his duty if they have. The only inquiry is, therefore, as to the fact of a payment according to the requirements of the law. If it has been made, the trustees are entitled to their decree. If it has not, a decree in their favor, as the case now stands, must be denied; but as the parties are all before the court, and the suit is in equity, it may be retained so as to determine what the trustees must do in order to fulfill the law, and under what circumstances the Governor can be compelled to execute the assignment which has been provided for." In *Reagan* v. *Farmers Loan & Trust Co.*, 154 U. S. 362, 390, where it was objected that the suit was in effect a suit against the State of Texas, the court, by Mr. Justice Brewer, said: "There

is a sense, doubtless, in which it may be said that the State is interested in the question, but only a governmental sense. It is interested in the well-being of its citizens, in the just and equal enforcement of all its laws; but such governmental interest is not the pecuniary interest which causes it to bear the burden of an adverse judgment. Not a dollar will be taken from the treasury of the State, no pecuniary obligation of it will be enforced, none of its property affected by any decree which may be rendered."

Finally, this is an equitable action brought to establish and enforce a trust in favor of plaintiff, with only an incidental prayer for a mandatory decree. It is not an original proceeding by mandamus, of which the Federal courts have no jurisdiction. *Bath County* v. *Amy*, 13 Wall. 244; *Jordan* v. *Cass County*, 3 Dill. 185; Fed. Cas. No. 7517; *County of Cass* v. *Johnston*, 95 U. S. 360, 370; *County of Greene* v. *Daniel*, 102 U. S. 187, 195; *Davenport* v. *County of Dodge*, 105 U. S. 237, 242.

It seems to me that the decree should be affirmed.