## STATE *ex rel.* TAYLOR v. COCKRELL.

### No. 1600.    Opinion Filed November 29, 1910.

**OFFICERS—State Examiner and Inspector—Right to Examine Records of Bank Commissioner.** The State Examiner and Inspector is authorized by Act of April 9, 1908 (Session Laws 1907-8, ch. 79, art. 1, pp. 701-705), as amended by Act of March 12, 1909 (Session Laws 1909, ch. 37, art. 3, pp. 567-569; Comp. Laws 1909, ch. 108, art. 6, secs. 8674-8680, pp. 1741-1743), to examine the office and records of the Bank Commissioner, including the records, books, papers, etc., of a failed or insolvent bank in his custody or control as such officer in winding up and administering the affairs of such bank, under the powers conferred upon him by said acts.

(Syllabus by the Court.)

*Original Action for Writ of Mandamus.*

Action by the State, upon the relation of Charles A. Taylor, State Examiner and Inspector, against E. B. Cockrell, State Bank Commissioner. Writ awarded.

*Charles West,* Attorney General, and *Charles L. Moore,* Assistant Attorney General, for plaintiff.

*Ledbetter, Stuart & Bell,* for defendant.

WILLIAMS, J. This is an original action for a writ of mandamus, instituted by the state of Oklahoma upon the relation of Charles A. Taylor, State Examiner and Inspector, against

A. M. Young, Bank Commissioner of the state of Oklahoma. After the petition was filed Mr. Young resigned as Bank Commissioner and Mr. Cockrell, who was appointed to fill his place, appeared and prayed that he might be substituted as party defendant in place of said A. M. Young, and, upon being made a party, he adopted the answer filed by Mr. Young and made the same his answer.

The office of State Examiner and Inspector exists in no other state of this Union by constitutional provision. Section 1 of art. 6 of the Constitution of this state provides:

"The executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner and Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law.".

In *State of Oklahoma ex rel. Attorney General v. A. H. Huston, District Judge, et al.* (*ante*), recently decided by this court, it was said:

"Under the Constitution of Oklahoma, which provides for the election of state, county and township executive officers alike by the people, the state executive officers below the Governor, with a few exceptions, are as independent of his control in the performance of their duties as are the officers of the counties or of the townships."

Obviously, the duties of the State Examiner and Inspector, as prescribed by the Constitution, are to be discharged by him independent of the Chief Executive of this state. It is not within the power of the Chief Executive to prevent the State Examiner and Inspector from discharging any duty imposed upon him by virtue of the Constitution or the statutory law as in force in this state. The duty of the Chief Executive arises when the State Examiner and Inspector fails to discharge his duty, it then

being the duty of the Chief Executive to see that the laws are faithfully executed and that all executive officers discharge the duties imposed upon them by law. However, under the clause providing that other duties and powers may be added by law, it is within the power of the Legislature to prescribe certain duties to be performed by the State Examiner and Inspector when directed by the Governor. (*State ex rel. Haskell, Governor, v. Huston et al.,* 21 Okla. 782, 97 Pac. 983. But where a duty·is imposed, not conditioned upon the direction of the Governor, but left to the discretion of the State Examiner and Inspector, it is not within the power of the Chief Executive to prevent the performance of such duty by him. The sole question involved in this case is as to whether the State Examiner and Inspector is authorized under the law to examine the records of the Bank Commissioner or banking department as to the collection and disbursement of the depositors' guaranty fund and the funds or assets of failed or insolvent banks received and disbursed by the Bank Commissioner or Banking Department in winding up the affairs of such bank, and if so, has such officer the authority, in order to verify the records of the receipts, collection and disbursement of such funds, to examine the record, books and papers of such bank while in the custody of the Banking Department? It is not contended on the part of the relator that the State Examiner and Inspector has any authority to inspect or examine any bank that is a going concern. As to the bank in question, the Columbia Bank and Trust Company, it seems that the Bank.Commissioner, after due examination of its affairs, having become satisfied of its insolvency, took possession of its assets and proceeded to wind up the same. As to the funds and assets of said bank, are they under the management of the state, and within the scope of section 1, art. 3, ch. 37, pp. 567-569, Sess. Laws 1909 (sec. 1, art. 1, ch. 79, p. 701, Sess. Laws 1907-8), wherein it is provided: "The Examiner and Inspector shall examine the books and accounts of state officers whose duties it is to collect or disburse funds of the state, or (under) its management at least once each

year"? That the Bank Commissioner is a state officer has not been and cannot be questioned. That the depositors' guaranty fund, and the funds of a failed bank in the hands of a Bank Commissioner for the purpose of reimbursing the depositors' guaranty fund, is as much a fund of the state as the common school fund is also true. The depositors' guaranty fund act was sustained by this court on the theory of the reserved power of the state to alter and amend charters of state banking corporations for the public welfare. See *Noble State Bank v. Haskell et al.*, 22 Okla. 78, 97 Pac. 595, which is in harmony with *Ozan Lumber Co. v. Biddie*, 87 Ark. 587, 113 S. W. 796; *New York Central & H. R. R. Co. v. Williams*, 92 N. E. (N. Y. Ct. App.) 404; and *Hammond Packing Co. v. Ark.*, 212 U. S. 320. This power exercised for the public welfare by the legislative act which causes to be levied the assessment "against the capital stock of each and every bank or trust company organized or existing under the laws of this state * * * equal to five per centum of its average daily deposits during its continuance in business as a banking corporation," for the purpose of protecting the depositors of such banks (sec. 3, art. 2, ch. 5, pp. 121-123, Sess. Laws 1909), is the same as that which levies, or causes to be levied, as tax upon the people and property within the state for the maintenance and support of the common schools and educational institutions. The title of such depositors' guaranty fund vests in the state just as much so as the common school lands, or the proceeds of the sale of the same, and the taxes levied and collected for the maintenance and support of said schools, all of which are held in trust by the state for a specific purpose. Even if it were not a state fund, it would at least be a fund under the management of the state. In that event the Bank Commissioner, being a state officer (sec. 1, art. 14, Const.) and a part of the executive department, would be brought within the terms of the act that imposes upon the State Examiner and Inspector the duty to examine the books and accounts of all state officers whose duties it is to collect and disburse funds under the management of the

state.    The qualifications of the State Examiner and Inspector are that he is to be an expert accountant with three years' experience.    He is also to be elected by the people in their sovereign capacity.    By section 60 of art. 5 of the Constitution it was made mandatory upon the Legislature to "provide by law for the establishment and maintenance of an efficient system of checks and balances between the officers of the executive department, and all commissioners and superintendents, and boards of control of state institutions, and all other officers entrusted with the collection, receipt, custody or disbursement of the revenue or moneys of the state whatsoever."    The title of the act passed by the first Legislature under this mandate is as follows:    "An Act relating to the office of State Examiner and Inspector, in compliance with section 152 of the Constitution of the State of Oklahoma, providing for a State Examiner and Inspector; and article 5, section 133, entitled, 'A system of checks and balances between officials'; defining duties and powers of State Examiner and Inspector; providing for appointment of an assistant, deputies and other employees, fixing salaries, providing for penalties, repealing all conflicting acts, and declaring an emergency."    (Sess. Laws 1907-8, p. 701).    The supplemental amendatory act passed by the Legislature of 1909, pursuant to the same mandate, is styled as follows:    "An Act amending an act entitled, 'An Act relating to the office of State Examiner and Suspector (Inspector), in compliance with section 152 of the Constitution of the state of Oklahoma, providing for a State Examiner and Suspector, and art. 5, section 133, entitled: "A system of checks and balances between officials"; defining duties and powers of State Examiner and Suspector (Inspector); providing for appointment of an assistant, deputies and other employees, fixing salaries, providing for expenses, providing for penalties, repealing all conflicting acts and declaring an emergency'; approved April 9, 1908; and prescribing additional duties and powers; and increasing the number of deputies, and declaring an emergency."

It is a settled rule of construction that we look to the context,

including the title of an act, in case of doubt as to the meaning of such act. *Rakowski v. Wagoner, County Judge*, 24 Okla. 282, 103 Pac. 632. By the title of said act, it is the declared purpose of said enactment to carry into effect the mandatory provisions of said section 60 by providing for a system of checks and balances between officers of the executive department and all other offi- cers entrusted with the receipt, custody or disbursement of the moneys of the state *whatsoever*. The State Bank Commissioner, cr the Banking Department, is a part of the Executive Department of the state, and is entrusted with the receipt, custody and dis- bursement of funds of failed banks. It being the declared pur- pose of the Legislature by said two acts to carry into effect said section 60, did said enactments reasonably have such effect?

Section 4 also provides:

"All officers of the state and counties of the state,   *   *   * must make written exhibits to the Examiner and Inspector under oath in such form and in such manner as he may prescribe, and each and every person so required who shall refuse and neglect to make such written exhibit, or to make or to give such informa- tion as may be required by said Examiner and Inspector, shall be deemed guilty of a misdemeanor; and if any person in making such exhibit or giving such information or affording any state- ment required under this Act, on his oath, shall knowingly swear falsely concerning the same, he shall be deemed guilty of perjury and punished accordingly. The State Examiner and Inspector shall have full power and authority for the various purposes named to examine books, papers, accounts, bills, vouchers and any other documents, or property of any or all of the aforesaid state institutions, all state officers and custodians of any county or state funds, also to examine under oath, county or state officers and custodians of county and state funds aforesaid. The State Examiner and Inspector is empowered to issue subpoenas and administer oaths in the performance of his duty, and any persons refusing access to said Examiner to any such books or papers, or any officer, clerk, employee or other persons aforesaid, who shall obstruct access and refuse to search for any required information, or who shall in any manner hinder the examination required by this Act of the records and books of the officers of public insti-

tutions or pertaining to county and state officers aforesaid, shall be deemed guilty of a misdemeanor    *    *    *"

The power to examine papers, accounts, bills and vouchers or any other documents of all state officers or custodians of county or state funds aforesaid, is referable to section 1, art 1, *supra,* wherein the duties are imposed upon the State Examiner and Inspector to examine the books and accounts of state officers whose duties it is to collect or disburse funds of the state or (under) its management *at least* once each year. It seems from this language that it is the duty of the State Examiner and Inspector to examine the books, papers, accounts, bills, vouchers and any other documents of the Banking Department, relative to the depositors' guaranty fund or any fund or assets of failed banks that have been handled by said department.

It is contended that the State Examiner and Inspector, in making this examination, is confined to the books of the Banking Department upon which the Bank Commissioner or other officer of said department has made entries or record relative to such fund or assets received, disbursed or disposed of. If this be true, an examination of such department in respect to the funds and assets of a failed bank that have been or are being administered by said department could result in no practical benefit. The result would be a valueless farce, for the State Examiner and Inspector, being confined to such record as contained only entries made by the Bank Commissioner or the Banking Department, would have no way to determine whether they spoke the truth. Whilst all officers are presumed to be without official wrong, yet it was the evident intention of the framers of the Constitution to have such system of checks and balances as would bring about an inquisitorial examination for the protection of the people, so that there could be no hidden official wrong. These organic and statutory provisions should be given a reasonable construction, to carry out the spirit and evident purpose of the lawmakers, and not by a restricted or narrow construction leave one of the most important branches of the executive department without an examina-

tion by the expert accountant or state officer elected by the people of the state for such purpose. There appearing to be no reason for such an exception and none seeming to have been made, such exception should not be interpolated by construction into this statute. It is the mandatory duty of the Examiner and Inspector to examine *at least* once a year the books and accounts of state officers whose duties it is to collect and disburse funds of the state, or funds under its management, it being left to his discretion to make other examinations during such year if he thinks best. The Governor, if he determines that other examinations than those made by the State Examiner and Inspector on his own motion are necessary, may call upon such State Examiner and Inspector to make such examinations, and it will be his duty to make the same.

The suggestion is made that, as it is his mandatory duty only to make one examination of said office each year, the records of failed banks may not remain permanently in the custody of the Banking Department. There being a discretion left to the State Examiner and Inspector as to whether he will make more than one examination, it is presumed that he will exercise such discretion to make at the proper and opportune time all necessary examinations. Why has he not, under the broad powers conferred upon him under these statutes, in order to determine whether the records of the receipts and disbursements of such funds are correct, a right to examine the original books and entries of such failed bank as to cash received and disbursed and as to bills receivable and bills payable, disposed of, etc., to determine whether said department, as to such insolvent bank, has faithfully administered its trust? If the records of such bank have been turned back to the directors and stockholders of the institution, why can't said State Examiner and Inspector, under his inquisitorial power and the authority vested in him by virtue of said section 4, issue subpoenas for the attendance of such officers of such bank, requiring them to bring with them such books and records as may be in their custody, that he may examine such parties under

oath and examine such records to make a thorough and complete examination of such departments? What is the sense of the requirement of such official or employees to make answer and to attach exhibits of said records covering such matters, if the originals may not be examined by him? Every citizen of this commonwealth has an interest in the faithful administration of the Banking Department and the honest disbursement and accounting of the depositors' guaranty fund and the winding up of the affairs of all failed banks.

In *Noble State Bank v. Haskell et al., supra,* it is said:

"Banks are chartered by the state, not with the paramount view of enabling the stockholders to make investments and derive profits therefrom, but to meet a public necessity. The stockholders, having made investments therein, should be protected, but private interest must always be subordinated by the state, in the reasonable exercise of its police power, to the public welfare or good. With the view that the depositor as well as the stockholder, and the general public with an incidental interest therein, may be protected, banking is regulated and limitations, restraints and requirements are imposed   *   *   *   In addition, to further and more completely protect the depositors, the depositors' guaranty fund is created, the Legislature acting pursuant to the mandatory declaration of the Constitution."

It was the purpose of the framers of the Constitution, in creating the office of the State Examiner and Inspector, with the mandate contained in section 60 of art. 5, to provide for the examining and the checking of the accounts of all officers handling the funds of the state or funds under its management, so that the interests of the people of this state could be safeguarded by each department and office not being depended upon to check itself. In section 1 it is specifically provided that no deputy of the State Examiner and Inspector shall examine the records of the county officers of the county in which he resides. This forcibly shows the intent and purpose of the Legislature to have a disinterested and impartial inspection and examination of the accounts of all officers. To say, after this care in framing the Constitution to provide for such office and imposing the manda-

tory duty upon the Legislature to act, and in pursuance of which the Legislature has acted and examination provided to be made of the records of *every state officer handling funds of the state or funds under its management*, and having further provided for the issuance of subpoenas and the administering of oaths so that witnesses might be subpoenaed and papers brought before such Examiner and Inspector, and making it a misdemeanor for any person or officer to obstruct such examiner making search in the examination of an office—that only an examination of the permanent records is authorized, is to fly in the face of the spirit and letter of the act. There is no provision in these statutes for the placing of the winding up of the affairs of a failed bank under the jurisdiction of a court. The provision is that the claims shall not be sold or compromised without being authorized by an order of court. This act contemplates that the affairs of a failed bank shall be wound up by the Bank Commissioner, and these records, while in the custody of the Bank Commissioner, are the records of his office. There is no contention in this case that these records were not in the custody of the Bank Commissioner. If we are not correct in this conclusion, there is no adequate provision for the examination of the School Land Department by the State Examiner and Inspector. For the authority to examine the same can be only by virtue of section 1, heretofore referred to, imposing the duty upon the State Examiner and Inspector to "examine the books and accounts of state officers whose duties it is to collect or disburse funds of the state or (under) its management at least once each year." For how can a correct examination of said department be made without verifying the entries on the records of said department by calling upon the depositories for copies of entries and amounts of money on deposit, and if he thinks it necessary, to subpoena the officers of the depositories, lessees and purchasers of land to further verify as to amounts of money received, paid or agreed to be paid? Certainly, if he had this authority as to the Commissioners of the Land Office, who are state officers, he has such authority as to the Bank Com-

missioner (a state officer) as to all papers in his custody relative to such trust fund. Nor would there be any adequate provision authorizing the examination of the office of the State Fish and Game Warden, if he were to be confined exclusively to the permanent entries and records made in such office by being excluded from calling upon the various deputies over the state for exhibits or subpoenaing, swearing and examining them as witnesses. The same would apply to the State Librarian, State Oil Inspector and other state officers. The fact is that section 1 is comprehensive and was intended to apply to every state officer authorized to collect or disburse funds, *whatsoever*, of the state or (under) its management *at least* once each year, and to provide for *effective*, not abortive, examinations. Section 2 is equally as comprehensive as to the "public, educational, charitable, penal and reformatory institutions belonging to the state," or "under the control of the state," leaving no exception. To adopt such a rule of construction as is contended for by the respondent, would curtail the power of a constitutional officer to examine one of the most important branches of the Executive Department of this state in handling trust funds and place an exception in the statute when the more reasonable construction places none there. The writ of mandamus, as prayed for, is therefore awarded.

DUNN, C. J., and HAYES and TURNER, JJ., concur; KANE, J., dissents.