STATE, EX REL. CLARENCE A. DAVIS, ATTORNEY GENERAL, APPELLEE, V. EXCHANGE BANK OF OGALLALA: HESTER WELPTON, INTERVENER, APPELLANT.

FILED JUNE 8, 1926.    NO. 23984.

1. **Banks and Banking:** STATE BANKS: SUPERVISION. The department of trade and commerce is vested with general supervision and control of state banks with authority to do all things reasonably necessary for the protection of depositors therein throughout the state. It also stands in the nature of a trustee for the state bank guaranty fund, and it is its duty as such to take such precautions as may be reasonably necessary to conserve and protect this fund.

2. ———: DEPOSITS: FINDING AS TO INTEREST. Evidence examined, and *held* that the finding of the district court that the Exchange Bank of Ogallala paid more than 5 per cent. interest per annum on deposits in suit is wholly unsupported by the evidence.

3. **Trusts:** TRUSTEE: ACTS AS FIDUCIARY. Where a trustee acts in good faith in discharge of the duties imposed upon his trust, and in a fiduciary capacity, he and the fund represented by him are not ordinarily subject to the limitations and disabilities which, under the facts in this case, would be imposed on and

attached to him when acting in his individual capacity only, because of the fact that he was a stockholder in and an officer of the bank.

4. **Banks and Banking:** GUARANTY FUND: DEPOSITS. Where, pursuant to an agreement made by the duly authorized officers of a state bank and the department of trade and commerce, and relied upon by all parties concerned, a trust fund is created by contributions, and the use of the property in part made and furnished by persons not stockholders, officers, or employees of the bank involved, which trust fund is placed in charge of a trustee (who is the president of and stockholder in such bank) and by said trustee, as such, pursuant to said agreement, such fund is deposited in said bank as a "general deposit," relying upon the express agreement that the same shall be within the protection of the state bank guaranty fund, and such trustee and *cestui que trust* concerned act in good faith without fraud or concealment of any material facts, after insolvency of the bank, in a procedure to determine the right of such fund so deposited to participate in the state bank guaranty fund, *held*, that the deposit thus made by such trustee must be deemed a "general deposit" within the protection of the state bank guaranty fund.

5. ——: ——: ALLOWANCE OF CLAIM. Evidence examined, and *held*, that, under the facts shown in the record, the claimant should be allowed the sum of $64,918.67, and interest as provided by law, as a valid claim against the state bank guaranty fund.

APPEAL from the district court for Keith county: J. LEONARD TEWELL, JUDGE. *Reversed.*

*Halligan, Beatty & Halligan* and *Carl E. Herring,* for appellant.

*W. C. Dorsey, L. O. Pfeiffer* and *C. M. Skiles, contra.*

Heard before MORRISSEY, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

EBERLY, J.

Hester Welpton, plaintiff and intervener, prosecutes this appeal from a final order of the district court for Keith county, denying a claim filed in the above-entitled cause, and adjudging "that the said sums ($66,525) were placed

in the said bank by the said intervener, Hester Welpton, under an arrangement whereby the said bank agreed to pay interest upon the said sums at a rate in excess of 5 per cent. per annum; that each and all of said sums constitute and was a loan to said bank and not a deposit, and that said Hester Welpton is not entitled to have said sums repaid to her out of the state bank guaranty fund of the state of Nebraska."

At the time of the inception of the transactions which form the basis of this controversy, the Exchange Bank of Ogallala was a state bank duly organized as such and a going concern. The intervener was its president, though not active, and was owner of 595 shares of the 750 shares of stock at $100 a share which formed the capital stock of this institution. Her daughter, Mabel, who was a director and stockholder, was owner of 30 shares of this capital stock, and the remaining 125 shares were owned by persons other than the parties herein named.

The Welpton Investment Company also forms a party to the transaction out of which the litigation before us in this case arises. This company was a corporation organized as such under the laws of Nebraska, having a paid up capital stock of 697 shares, each share with a face value of $100. Hester Welpton was the president of this company and the owner of 258 shares of its stock. Mabel Welpton was the owner of 405 shares of its stock of similar denomination, and 34 shares of stock were owned by persons who, so far as the record discloses, had no connection whatever with the Exchange Bank of Ogallala.

It would seem that the following provisions of our statute are applicable to some of the different phases which make up this transaction: Section 284, Rev. St. 1913, provides: "There is hereby created a state banking board which shall consist of the following state officers: The governor, who shall be ex officio chairman thereof; the auditor of public accounts and the attorney general, a majority of whom shall constitute a quorum for the transaction of business. Said board shall have general supervision and control of banks

and banking under the laws of this state." This act was amended in 1919 so that at the time of this transaction it read as follows: "The department of trade and commerce shall have general supervision and control of banks and banking under the laws of this state. * * * Said department of trade and commerce shall succeed to all the rights, powers, duties and responsibilities of the state banking board as now existing and as such shall be entitled to all the records, books, files and papers thereof, and shall exercise all the powers and discharge all the duties of such board under the laws of this state." Section 7982, Comp. St. 1922.

In construing that portion of the language found in section 284, Rev. St. 1913, which is identical with section 7982, Comp. St. 1922, both of which are quoted above, this court said: "We think the intention of the legislature was to vest the banking board with general control and with authority to do all things reasonably necessary for the protection of depositors throughout the state. The board also stands in the nature of a trustee for this guarantee fund, and it is its duty to take such precautions as may be necessary to protect its integrity. The terms 'general supervision and control' vest the banking board with duties of a very high order, and they are not to be perfunctorily discharged, but to be administered with the highest degree of intelligence and discretion." *State v. Morehead,* 99 Neb. 146. This language was approved in the opinion of Rose, J. (dissenting), in *State v. Morehead,* 100 Neb. 864.

Section 8029, Comp. St. 1922, provides that under conditions specified the department of trade and commerce shall communicate certain facts to the attorney general who shall thereupon cause an application to be made in the district court of the county where such corporation maintains its bank for the appointment of a receiver to take charge of the business and assets and property of the corporation and to wind up its affairs.

Section 8033, Comp. St. 1922, provides that the claims of depositors, for deposits, and claims of holders of exchange

shall have priority over all other claims, except federal, state, county and municipal taxes, and, subject to such taxes, shall at the time of the closing of a bank be a first lien on all the assets of the banking corporation. There is the further provision that, in event the cash in the hands of the receiver, available for the purpose of paying such claims, be insufficient, the court, in which the receivership is pending, shall determine the amount required, which, in the manner therein specified, shall be paid upon the order of such court out of the state bank guaranty fund and applied on the claims of depositors and holders of such exchange.

Section 8035, Comp. St. 1922, provides for the subrogation of the department of trade and commerce for the use and benefit of such guaranty fund to all rights of creditors thus paid, and to participate in the assets of the bank.

The evidence in the record is undisputed as to the following facts: Prior to November 5, 1921, the Exchange Bank of Ogallala was in critical condition. The depositors had been making withdrawals to such an extent that the officers of the bank were unable to meet the same from current collections. Following an examination by the state banking department, attorney general Davis, representing the department of trade and commerce, went to Ogallala, together with another representative of that department, and called Hester Welpton and Mabel Welpton to the bank for a conference. The result of that conference was that, in reliance upon the unconditional statement of the then attorney general and the representative of the department of trade and commerce, then present, that the moneys to be raised and deposited as hereinafter set out would be and constitute a general deposit, and as such would be within the protection of the state bank guaranty law, in compliance with the recommendations and pursuant thereto, an agreement was entered into and arrangements were made by and between Hester Welpton, Mabel Welpton, and the Welpton Investment Company, a corporation, that the private property of Mabel Welpton, Hester Welpton, and the Welpton Investment Company should be pledged to secure

the loan of approximately $40,000, with provisions for its increase to an aggregate not to exceed $75,000, and that the proceeds thus secured should be placed in the possession and control of Hester Welpton and deposited as a general deposit in the Exchange Bank of Ogallala in a manner to bring it within the protection of the state bank guaranty fund, to be subject to use by her for certain restricted purposes only, which were deemed to be for the benefit, not only of Hester Welpton and Mabel Welpton, but of the Welpton Investment Company also.    In pursuance of such arrangement to provide the necessary funds for the purpose contemplated, a trust agreement was drawn and executed by Hester Welpton, Mabel Welpton, and the Welpton Investment Company, and notes of the face value of $40,000, bearing interest at 10 per cent. per annum from maturity, were made and signed in the name of Hester Welpton, and which were secured by the provisions of the trust agreement and the conveyances to be made pursuant thereto by Hester Welpton conveying to the trustee named in the agreement 2,984 acres of land of a value not stated, and by the Welpton Investment Company conveying to the same trustee 2,930 acres of land of a value not stated, and by Hester Welpton pledging as additional security 258 shares of stock of the Welpton Investment Company, and by Mabel Welpton pledging 405 shares of stock of the Welpton Investment Company.    These notes and this agreement were then delivered to and received by the Attorney General Davis. The record, as an entirety, supports but one inference which is the condition of delivery that Attorney General Davis was to and did proceed to Omaha and consummate the transaction, and that the net proceeds thereof were to be deposited in the Exchange Bank of Ogallala to the credit of Hester Welpton as contemplated by the trust agreement "as a general deposit" and "not a loan."

It was also contemplated that said deposit thus made would and could be used by Hester Welpton as trustee solely for the purpose of "financially assisting the Exchange Bank of Ogallala or the Welton Investment Company, both

or either, and for no other purpose." Such, indeed, were the
terms of the trust deed after it had been finally corrected
and executed by Hester Welpton and Mabel Welpton in
their own behalf and by the Welpton Investment Company,
and after the same had been formally accepted by the First
Trust Company of Omaha, trustee, for the banks for whose
benefit it was given.    It is admitted by the record that
there was actually turned over to the bank as net proceeds
of this first transaction $35,149.14.    One note executed to
the First National Bank of Lincoln as part of the $40,000
was not accepted by the payee and therefore returned to
the maker.    In December, 1921, for the same purpose and
pursuant to this agreement, and upon the same terms, there
were $24,000 additional notes executed in the same manner
and on which the bank realized $23,404.54.    And in Jan-
uary there was $6,525 of additional notes executed in the
same manner and for the same purpose on which was real-
ized the sum of $6,364.99, making a total deposit of
$64,918.67.

There can be no question under the record but what all
the facts of the transaction, together with the terms of
the trust agreement, both as originally and finally con-
summated, as well as the oral agreement between
the Welptons and the Investment company, were at all
times known to and approved by the attorney general, the
department of trade and commerce, and the officers in actual
charge of the Exchange Bank of Ogallala.

It also appears without question that there was no ex-
press understanding or agreement, nor was there any direc-
tion on the part of the Welptons or of the Welpton Invest-
ment Company, that any interest or discount should be paid
by the bank on the loans thus made.    The record plainly
supports the inference that, in view of the general customs
of banks and forms of the note made use of, the intent of
all persons concerned was that it was only the net proceeds
of the several notes discounted that was intended to be
deposited in the bank, and that the credits and charges
made upon the books and records of the bank covering the

difference between the face of the notes and the discount retained by the banks with whom the notes were negotiated were made wholly without knowledge, direction, or authority of the Welptons or the Welpton Investment Company, and that in truth, and in fact, no interest whatever was actually paid by the bank on any of these notes.

While it may be admitted that the book entries of the bank disclose a charge of a total of $1,593.01 discount, and $13.32 revenue to "Undivided Profits" account, these entries arise because of the failure of the bank officers to make a proper entry of the original transaction which should have been confined and limited under an agreement to entries showing a general deposit of the net amount received by the bank which would be determined by the face of the notes actually made use of less discount exacted and necessary revenue paid. False entries upon the books of the bank could not deprive the claimant in this case of her status as a depositor, nor could it relieve the bank guaranty fund of this state from its liability therefor. *State v. American State Bank,* 108 Neb. 129; *State v. Farmers State Bank,* 112 Neb. 474.

The entire transaction which resulted in the placing of the proceeds in the Exchange Bank was entered into, carried out, and consummated in strict reliance upon the representation and statement and the agreements hereinbefore referred to.

There is nothing in the record which in any manner or in the least degree tends to impeach the absolute good faith and honesty of the Welptons and of the Welpton Investment Company. And it cannot be gainsaid that, because of the aforesaid representations and approval, and agreement, the bank actually secured $64,918.67 in actual money or actual money's worth. This conclusion is not denied by the state. Indeed, the situation is met only by the legal argument made by the state as representative of the state bank guaranty fund that the fact that intervener may have been erroneously advised or assured by her own agent, or by the attorney general, or by some representative

of the state banking department, that the money so obtained and placed in the bank would constitute a deposit protected by the guaranty fund, would not amount to a contract binding on the guaranty fund, since, under the facts and circumstances as they actually happened, the transactions in question were "for the purpose of effecting a loan of funds" to the Exchange Bank. With this contention we are not in accord.

It is to be remembered that the Welpton Investment Company was and is a corporation. It is in law an entity, separate and distinct and apart from its officers, stockholders, or employees. Its legal relations to the Exchange Bank were in no manner affected by the fact that some of its officers and stockholders were also officers and stockholders of the bank. In fact, the Welpton Investment Company could make a deposit at any time, notwithstanding it might have knowledge that the bank was "in need of money," and such deposit would be within the protection of the guaranty law. *Farrens v. Farmers State Bank,* 101 Neb. 285.

Because its officers determined that the proposed proceedings would result in and were for the "benefit of the company," assets of the Welpton Investment Company, together with certain assets of Hester and Mabel Welpton, were pledged and mortgaged, and the fund of $64,918.67 was created thereby. This fund was entrusted to Hester Welpton under the limitations which made her a "trustee," and as such to manage it in the manner contemplated by the trust agreement for the benefit of all parties, including the Welpton Investment Company.

It may be said in passing that, "A trust, in its simplest elements, is a confidence reposed in one person, who is termed trustee, for the benefit of another, who is called the *cestui que trust,* respecting property which is held by the trustee for the benefit of the *cestui que trust.* It has also been defined as an obligation on a person to whom the legal title to property has been transferred arising out of a confidence reposed in him to apply the property faithfully

and according to such confidence." 26 R. C. L. 1167, sec. 1.

"A trustee is a person holding the legal title to property, under an express or implied agreement to apply it, and the income arising from it, to the use and for the benefit of another person, who is called the *cestui que trust.* * * * The trustee and beneficiary must be distinct personalities, or otherwise there could be no trust, and the merger of interests in the same person would effect a legal estate in him, of the same duration as the beneficial interest designated. However, a trust is not rendered void by the appointment of one of several beneficiaries as trustee." 26 R. C. L. 1271, sec. 121.

We have, then, in this transaction, all the elements of a valid trust. The Exchange Bank so understood it and the record shows that the account of the transaction was carried on its books in the name of "Hester Welpton, Trustee." It follows that the entire sum must be deemed a "trust fund," a fact which was known and understood by all of the parties. And this in turn supports the conclusion that the fund could not be considered as the private property of Hester Welpton, or as being owned or controlled by her as an individual. The Welpton Investment Company, under the terms of the security agreement, is a *cestui que trust* and interested as to the application of every dollar of it, and was clothed with authority to compel the full and complete performance of the terms of the trust. The bank, with full knowledge, took and received the deposit from and under the trustee as a "deposit." "It is now a universal rule that all those who take under the trustee, except purchasers for a valuable consideration without notice, take subject to the trust, and they must either execute the trust themselves, or convey the property to new trustees appointed by the court." 1 Perry, Trusts (6th ed.) sec. 346.

The facts of the case bring it squarely within the doctrine announced by this court in the case of *Cady v. South Omaha Nat. Bank,* 46 Neb. 756, in which this court quoted ap-

provingly the following: " 'It may be stated as a general principle that, if money deposited in a bank was held by the depositor in a fiduciary capacity, its character is not changed by being placed to his credit in his bank account.' And the same principle is recognized in the following cases: *Third Nat. Bank v. Stillwater Gas Co.*, 36 Minn. 75; *Peak v. Ellicott*, 30 Kan. 156; *Baker v. New York Nat. Exchange Bank*, 100 N. Y. 31; *Whitley v. Foy*, 6 Jones Eq. (N. Car.) 34; *National Bank v. Insurance Co.*, 104 U. S. 54; *Union Stock Yards Bank v. Gillespie*, 137 U. S. 411.

"Analogous in principle, also, is the doctrine, abundantly supported by authority, that a partner cannot, without the consent of his co-partners, apply the firm property in satisfaction of his individual liabilities, and that upon one so receiving partnership property is cast the burden of proving either consent by the other partners, or facts which amount to an equitable estoppel as against them. *Kendal v. Wood*, 6 L. R. Ex. (Eng.) \*243; *Heilbut v. Nevill*, 4 L. R. C. P. (Eng.) \*354; *Rogers & Sons v. Batchelor*, 12 Pet. (U. S.) \*221; *Davis v. Smith*, 27 Minn. 390; *Farwell v. St. Paul Trust Co.*, 45 Minn. 495; *Johnson v. McClary*, 131 Ind. 105. See, also, Parsons, Partnership (4th ed.) sec. 90, and note; 2 Bates, Partnership, sec. 1046; *Dob & Dob v. Halsey*, 16 Johns. (N. Y.) \*34; *Mutual Nat. Bank v. Richardson*, 33 La. Ann. 1312."

It follows, therefore, that the failure of the bank to properly enter these deposits on its books to the credit of Hester Welpton, trustee, cannot militate against the rights of the trust fund. And it must be considered as a trust fund duly deposited to the extent of $64,918.67. It also follows that a trustee exercising the duties of his office in good faith cannot be considered, when acting in his official capacity as such trustee, as either an officer, stockholder, or employee of the bank with whom he deals; and so, too, neither can the trust fund which the bank received with full knowledge of the facts be considered, as between depositor and bank, as private funds of the trustee for any purpose whatsoever.

In other words, Mrs. Hester Welpton, as "trustee," made "good-faith deposits" of the sums in controversy in this case in the Exchange Bank of Ogallala, and she had no authority in that capacity to make a loan. Her authority was expressly limited by contract, of which the bank had due and actual notice, to the making of "general deposits." With knowledge of this, the bank with the approval of the department of trade and commerce accepted the moneys thus raised, constituting the trust fund, with the express agreement, at least evidencing the intention of all parties concerned, that the deposit should be a general deposit and within the protection of the state bank guaranty law. These deposits constitute, therefore, a general deposit, unless the fact that Mrs. Welpton was also, in addition to "trustee," an officer and stockholder of the bank.

It must be remembered, however, that her capacity as "trustee" was distinct from her individual capacity. Indeed, under the facts of this case, she must be deemed as possessing two distinct and separate identities—one as an individual, and one as trustee.

The conclusion would be, therefore, that the limitations and disabilities, which, under our banking act, attached to one, have no legitimate connection with the other.

It follows, therefore, that under the facts in this case the entire transaction does not disclose a claim in behalf of the plaintiff upon any evidence of indebtedness in the hands of, or originally issued to, any stockholder, officer or employee of such bank, which represents money obtained by such stockholder, officer, or employee from himself or some other person, firm, corporation, or bank, in lieu of or for the purpose of effecting a loan of funds to such failed bank. The money here deposited must therefore be deemed a general deposit, within the protection of the guaranty fund.

The judgment of the district court is reversed and the cause remanded for further proceedings in accordance with this opinion.

REVERSED.