STATE, EX REL. O. S. SPILLMAN, ATTORNEY GENERAL, V. NEBRASKA STATE BANK OF HARVARD: VAN E. PETERSON, RECEIVER, APPELLANT: J. H. YOST LUMBER COMPANY, INTERVENER, APPELLEE: SECURITY STATE BANK OF LAWRENCE, INTERVENER, CROSS-APPELLANT.

FILED JUNE 17, 1929. No. 26863.

*Butler & James* and *C. M. Skiles*, for appellant.

*Stiner & Boslaugh*, for J. H. Yost Lumber Company.

*Perry, Van Pelt & Martin*, for Security State Bank.

Heard before DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ., and LIGHTNER and REDICK, District Judges.

REDICK, District Judge.

Appeal by the receiver and cross-appeal by Security State Bank of Lawrence from an allowance of a claim in favor of the J. H. Yost Lumber Company against the depositors' guaranty fund in the receivership proceedings of Nebraska State Bank of Harvard. The claim was scheduled by the receiver as one not payable out of the fund,

whereupon claimant filed his petition in the district court. Answers were filed by the receiver and the Security State Bank of Lawrence, intervener. The issues will appear from the discussion in the opinion. By the judgment of the district court the claim was allowed against the fund in the sum of $19,185.43, with interest at 7 per cent. per annum from the date of the judgment.

From the pleadings and evidence the following situation appears. On or about May 1, 1926, the Union State Bank of Harvard was in the hands of a receiver for the purpose of liquidation, and a proposal was made by the Nebraska State Bank of Harvard to take over the assets and assume certain of the liabilities of the Union State Bank. This proposal was approved by the receiver and the court, and resulted in a contract to that effect on May 10, 1926, and the Nebraska State Bank continued in business until May 4, 1927, when it was taken over by the guaranty fund commission, and on May 9, 1927, a receiver appointed to wind up its affairs.

At the time of the purchase by the Nebraska State Bank, the claimant, J. H. Yost Lumber Company, was a depositor in the Union State Bank, having to its credit, subject to check, the sum of $15,595.41, which was one of the deposits assumed by the purchasing bank. At the time of the closing of the Nebraska State Bank, claimant had on deposit the sum of $19,185.43, subject to check.

Claimant had an agreement with the Union State Bank that it would pay 4 per cent. interest on daily balances, and this arrangement was continued with the Nebraska State Bank. This was the highest rate of interest permitted by the statutes of this state to be paid by state banks.

There was an arrangement between the Nebraska State Bank of Harvard and the Omaha National Bank of Omaha, its correspondent, whereby checks drawn by its customers upon the Nebraska State Bank would be paid by the Omaha bank without any charge for exchange, and charged to the account of the Nebraska State Bank; and the Nebraska State Bank furnished claimant with a stamp to be imprinted upon its checks containing the following words:

"Payable, if desired, at par through Omaha National Bank, Omaha, Nebraska." It does not appear whether or not these stamps were furnished to other customers. A number of objections, of a novel and interesting character, are presented by the receiver and intervener to the allowance of the claim against the depositors' guaranty fund, and we will now consider them in the order in which they are presented by the brief of appellant.

■ It is urged that the arrangement by which claimant's checks were to be paid at par by the Omaha National Bank resulted in the payment of interest in excess of 4 per cent. allowed by law; or, that thereby the bank gave a consideration or rendered a service to the depositor as an inducement, in addition to the legal interest, for making or retaining a deposit in the bank, and had the result to withdraw the deposit from the protection of the guaranty fund. The law under which this claim is made is section 1, ch. 28, Laws 1925, which, as far as applicable, reads as follows:

"No banking corporation transacting a banking business under this article shall pay interest on deposits, directly or indirectly, at a greater rate than * * * four per cent. per annum. * * * Any officer, director, stockholder or employee of a bank or any other person who shall, directly or indirectly, either personally, or for the bank, pay any money or give any consideration of value, or render any service for, or at the request of, a depositor or any other person as an inducement, in addition to the legal rate of interest, for making or retaining a deposit in the bank, or any depositor who shall accept any such inducement shall be deemed guilty of a felony." And the act provides for a fine or imprisonment in the penitentiary. Also, "Deposits made in violation of this section shall not be entitled to priority of payment from the assets of the bank, nor be protected by the guaranty fund."

It is not claimed that this arrangement was entered into between claimant and the bank with the unlawful purpose to increase the rate of interest upon the deposit beyond that permitted by law, but it is argued that such is its effect, the

ratiocination being that, when the check is charged to the account of the Nebraska State Bank by the Omaha National Bank, one or more days elapse before it is returned to the Nebraska State Bank, during which period 4 per cent. interest is accruing upon the deposit; or, that the interest allowed the Nebraska State Bank by its correspondent ceases a day or two earlier than it would have done if the check had been sent for collection. In other words, the depositor gets the benefit of interest on the float.

The arrangement for parring checks through the Omaha National Bank was one between the two banks, and, for aught that appears in the record, was available to all depositors of the Harvard bank. Neither the claimant nor its president was a party to the arrangement, and the record fails to show that any checks of the claimant were cashed at par by the Omaha bank. The furnishing of the stamp to claimant was not in consequence of any special contract or arrangement between claimant and the Harvard bank, but it was mailed to claimant by the bank after it had succeeded the Union State Bank. It amounted, so far as the record shows, merely to a notice to plaintiff of an existing arrangement between the two banks of which claimant might have the benefit. It seems altogether probable that it never entered the mind of either party that the accommodation thus granted would result in an allowance of interest on claimant's account slightly in excess of 4 per cent. In fact, it seems that such result, if in fact it existed, was apparent only after the bank had failed and the transaction submitted to the scrutiny of ingenious counsel and officers of the guaranty fund commission. It is suggested by counsel for receiver that the burden of proof is upon the claimant to establish that no specific limitation of the guaranty fund act has been transgressed (*State v. Security State Bank,* 116 Neb. 223), and it may be that some of the matters above referred to as not appearing of record might have been brought into it by the claimant; but, if the evidence in the record is sufficient to bring the deposit within the protection of the fund, the fact that claimant did not produce all the

evidence within reach favorable to his contention will not be held to affect the result.

The principal office of the Yost Lumber Company is at Lincoln, Nebraska, to which city it had been removed from Harvard some time prior to the transaction involved herein. It operated no yard at Lincoln, but at several towns surrounding Harvard. It had transacted its banking business with the Union State Bank and continued with the Nebraska State Bank of Harvard. After removal to Lincoln the company continued to keep its principal banking account at Harvard, the reason for which being stated by Mr. Yost as follows:

"The matter of fact is that the Harvard bank, me being interested in it in previous years and it being in my home town, when we moved to another town we kept the bulk of our deposits there, because they gave us the privilege that we could stamp the checks payable at par at the Omaha National from all that time on, and of course our checks going at par was better than we could do at the—better than we could do out of Lincoln, you know, and even when living at Lincoln we never kept more than a checking account locally, for some accounts around there, and the balance was always kept at Harvard, and we never borrowed any money to keep up the deposit. We just kept our natural run of balances from year to year in the bank and no more."

With reference to the stamp, he testifies: "Every check is stamped that way, you know, so our collections or our customers can get away from paying collections on checks." It seems, therefore, that one of the considerations leading to the maintaining of the deposit in the Harvard bank was the fact that claimant's checks could be parred through the Omaha National Bank. It does not appear, however, that this had any connection with the agreement for the payment of interest upon daily balances. The account of claimant was by far the largest in the bank and its daily balances were such that the agreement for interest does not appear unreasonable.

Under these circumstances the question for determina-

tion is whether or not the deposit of claimant transgressed the limitations of the guaranty fund act. The statute is highly penal and should be strictly construed. The remark of the court in *Kelley v. Gage County*, 67 Neb. 6, that, "in the exposition of statutes, the reason and intention of the lawgiver will control the strict letter of the law when the latter would lead to palpable injustice or absurdity," is applicable.

The purpose of the statute is to penalize corrupt agreements entered into with the intention of evading the law as to allowable interest, and while contracts which plainly and inevitably result in an infraction are within the spirit of the prohibition, we do not think that the legislature intended to anathematize transactions not tainted with an evil purpose, and which merely may or may not result, and that only incidentally, in an unimportant advantage, and which can only be brought under the condemnation of the statute by an attenuated process of reasoning. We disclaim any intention to criticize the learned counsel for the receiver. Their argument is most ingenious and of considerable force. But, for the reasons stated, we are of the opinion that the arrangements for parring checks did not transgress the limitations of the guaranty act, and that the construction of the statute contended for by the receiver is not justified by its words or purpose, and would, in the language of claimant's counsel, "draw within its sweeping terms multitudes which the legislature clearly did not intend to include."

■ The next objection to the allowance of the deposit as a claim against the guaranty fund is based upon a claim that interest was paid thereon in excess of 4 per cent. allowed by law. This claim is based upon the fact that the sum of $17.64, being the interest on the daily balances from May 1 to May 10, a period prior to the purchase by the Nebraska State Bank, was credited to the claimant, and was interest due from the Union State Bank. By the contract of purchase the Nebraska State Bank did not agree to pay any accrued interest on deposits subject to check, and, therefore,

would have been justified in starting its credits for interest May 10. Technically this might be considered a payment of excess interest, but, so far as claimant is concerned, was not contracted for, nor does it appear that he had any knowledge of this particular credit. Under these circumstances we think it would not be just to withdraw the deposit from the protection of the fund. The Nebraska State Bank was the successor to the Union State Bank, and the item in question may be properly disposed of as a matter of bookkeeping in the final adjustment of the account. However, as a matter of fact, the total amount of interest on daily balances credited by the bank was $720.78, whereas the correct amount should have been (exclusive of the first ten days in May) $777.78. It therefore appears that there was no excess interest paid. True, on May 4, 1927, the day the bank was taken over by the guaranty fund commission, a deposit slip for $122.76, representing interest on April daily balances, was issued to claimant and is included in his claim herein, but the same was never entered upon the books of the bank and was apparently issued after the bank had been taken over. We are of the opinion that this did not constitute a payment of excess interest. Claim for these amounts was withdrawn at the trial, and while such withdrawal would be ineffectual to cure a prior excess interest payment, it should be permitted under the circumstances.

■ It is next claimed that the deposit in question was in violation of section 12, ch. 30, Laws 1925, reading as follows:

"No claim to priority shall be allowed which is based upon any evidence of indebtedness in the hands of or originally issued to any stockholder, officer or employee of such bank, which represents money obtained by such stockholder, officer or employee, from himself or some other person, firm, corporation or bank in lieu of or for the purpose of effecting a loan of funds to such failed bank."

J. H. Yost was a stockholder, but not a director, in the Nebraska State Bank to the extent of $500. He and his family were the owners of 95 per cent. of the stock of the

lumber company. The statute required the bank to keep a reserve of at least 15 per cent. of its deposits. From October 1, 1926, until the bank was taken over, the reserve was depleted, varying all the way from 5 per cent. to 12 per cent. It does not appear that Yost or the lumber company had any knowledge of the condition of the reserve, although Yost had been requested in the latter part of 1926 to leave as large a balance as possible in the bank for the balance of the year, and on December 20, 1926, wrote the bank: "We have been keeping this in mind and are holding off everything we possibly can. However, we have bought quite a bit of lumber to assort up our stocks after invoicing and some of that is shipped and, of course, in order to get our discount, we must pay when due. But we will try to check out as much as we can from the yards until after the first of the year to give you a chance to show as good a statement as possible." And on March 9, 1927, he wrote: "I don't like the idea of leaving too much cash in the bank and would like to swing some of the money now on deposit into well-secured notes. I would buy them outright and this would give you the cash and I would feel safer by doing so."

It is argued that the language of these letters can mean only that the Nebraska State Bank was pressed for funds, and that Yost was keeping as large a balance there as possible to help them. This might be true, and still not be an infraction of the law. It appears beyond question that the deposits of claimant were such as accumulated in the ordinary course of claimant's business, the balances varying from $4,000 to $40,000, and the evidence does not establish that any sum at any particular time was deposited or maintained for the unlawful purpose of bolstering up the reserve fund of the bank. In *State v. Farmers State Bank*, 113 Neb. 348, under a statute denying to a stockholder the right of priority if he borrows money for the bank or bases his claim to priority on an evidence of indebtedness representing money obtained by him for the purpose of effecting a loan of funds to the bank, it was held that such statute does not prevent a stockholder from individually depositing his

own money in the bank in good faith for his own benefit, nor from participating individually in the bank guaranty fund, where he does nothing to forfeit that right. In that case the deposits were made in the ordinary course of business and did not constitute loans to the bank. So here, as above suggested, there is no evidence tending to show that the deposits in question evidenced loans to the bank, but, on the contrary, were made in the usual course of business. There is nothing inconsistent with this holding in the cases cited by the attorney general (*State v. Farmers State Bank*, 117 Neb. 448; *State v. Security State Bank*, 116 Neb. 521; *State v. Atlas Bank*, 114 Neb. 646), nor with any other of our decisions we have been able to find. Furthermore, the Yost Lumber Company was not an officer or employee or stockholder of the bank, and the deposits had always been carried in the company's name. It would therefore appear that the claimant is not one of the persons referred to in the statute. Paraphrasing what was said in *State v. Exchange Bank*, 114 Neb. 664, at page 672: "In fact, the J. H. Yost Lumber Company could make a deposit at any time notwithstanding it might have knowledge that the bank was 'in need of money,' and such deposit would be within the protection of the guaranty law." The deposit was not money obtained from a corporation for the purpose of effecting a loan of funds to the bank, but was the act of the corporation, a separate entity, in the ordinary course of business.

The next contention of the receiver is in the following language: "That the depositors' guaranty fund does not expressly or by necessary implication contemplate that interest upon open accounts subject to check shall be protected by the depositors' guaranty fund, and, the fund being a creation of the statute, no liability can be imposed thereon by a bank officer that is not expressly or by necessary implication contemplated by the statute."

It is said that "interest upon open checking accounts is not ordinarily paid in Nebraska, and the legislature must be taken to intend that interest should not be protected by the depositors' guaranty fund on open checking accounts."

Nowhere are banks prohibited by statute from paying interest on open accounts, and, while not a common practice, it is a matter of common knowledge that in some instances such interest is paid. In fact, as to public moneys, the statute requires payment of such interest, and in the case of county funds fixes the rate at 2 per cent. There is, therefore, nothing illegal in the practice, and with the question of business policy involved therein we are not concerned. It is true that the fund is not liable beyond the terms of the statute (*State v. Security State Bank*, 116 Neb. 521; *Rogers v. National Surety Co.*, 116 Neb. 170), but the protection is extended to the deposit, and interest is a mere incident. If interest is lawfully contracted for, paid and deposited in the bank, we perceive no reason for distinguishing it from the main body of the deposit. It is argued that, because the statute provides that "holders of certificates of deposit shall not be entitled to payment until their maturity," this amounted to a legislative direction that interest should be paid on certificates (*State v. Farmers State Bank*, 113 Neb. 679), and that the rule "*expressio unius est exclusio alterius*" applies. We think not. The prohibition is against payment before maturity, and while this affords an implication of liability for interest during the waiting time, it in no way excludes such liability in other cases.

In *Central State Bank v. Farmers State Bank*, 101 Neb. 210, a separate claim for interest on a deposit subject to check, in accordance with the agreement of the bank, was allowed as a claim against the fund. In *State v. Nebraska State Bank*, 111 Neb. 360, involving the allowance of interest upon a certificate of deposit, it was said:

"While it is true that the assessment of state banks for the creation of the guaranty fund is made upon a percentage of the actual deposits in such banks, there is no specific provision in the statute restricting the payment to depositors from that fund to the exact amount of money deposited. Under section 8033, Comp. St. 1922, it is the *claims* of depositors for deposits and the claims of holders of exchange which are accorded priority, and are a first lien on all the

assets of the corporation. * * * Money on deposit in the state banks of Nebraska is largely upon time deposit and is evidenced by the issuance of interest bearing certificates of deposits. The guaranty fund law expressly provides that interest may be paid by a state bank not in excess of 5 per cent. per annum. The fair implication is, when this provision is found in the law creating the fund, that the intention was to make the fund liable for the payment of such interest."

It was further suggested in that case that the same arguments against the allowance of interest on a certificate of deposit would apply to interest paid to depositors by savings banks, in connection with which the court said: "Could it ever have been the intention of the legislature to deprive the small depositor in such a bank of the protection afforded by the guaranty fund to the interest earned by the use of his money? Unless the statute is clear that this was its intention we cannot so hold."

Counsel for the receiver refers to *State v. Farmers & Merchants Bank,* 114 Neb. 82, as holding: "Where bank deposit was misappropriated, and depositor protested, asking that it be converted into time deposit, drawing interest, but no rate was agreed on, and deposit was never changed to time certificate," interest would not be allowed. This quotation was probably taken from the syllabus from that case as reported in 206 N. W. 158. That syllabus, however, was not carried forward in the regular report of the case, in which the court used the following language: "The district court allowed Ossenkop interest from the date the money was wrongfully withdrawn from his account by the bank's cashier. We think this was error. The deposit never was changed to a time certificate, *or to an interest-bearing deposit*"—thus impliedly recognizing the existence of an interest-bearing deposit not evidenced by a certificate. Interest was disallowed because no rate had been agreed upon, not because the deposit had not taken the form of a time certificate. The implication from the fact that the guaranty fund law expressly provides that a state bank may pay in-

terest, that it intended to make the fund liable therefor (*State v. Nebraska State Bank,* 111 Neb. 360), is as forceful as to interest on daily balances as on time certificates.

We think by these cases we are committed to the rule that interest upon deposits subject to check, when contracted for, may be a proper charge against the guaranty fund.

■ It is, however, earnestly contended by counsel for the receiver that the payment of interest out of the depositors' guaranty fund is beyond the power of the legislature to prescribe; that no consideration of public health, morals, safety, or general welfare is advanced by such legislation, and, therefore, the exercise of the police power in that direction is illegal and contrary to the provisions of the Constitution of the United States against the taking of private property for a private use and without due process of law. These same arguments were presented to the supreme court of the United States as exhibiting the unconstitutionality of the bank guaranty act, and were held untenable in the cases of *Noble State Bank v. Haskell,* 219 U. S. 104, *Shallenberger v. First State Bank,* 219 U. S. 114, and *Assaria State Bank v. Dolley,* 219 U. S. 121. These decisions are conceded by counsel to be conclusive upon the validity of the act with reference to the deposit itself, but it is strongly insisted that to extend the protection to interest on the deposit is not necesary for the accomplishment of the purposes for which the act was sustained as to the principal of the deposit, nor within any of the reasons adduced by the supreme court in support of their holding. The following is quoted from the opinion in the *Noble State Bank* case, as furnishing the only basis upon which the legislation was sustained:

"It may be said in a general way that the police power extends to all the great public needs. *Camfield v. United States,* 167 U. S. 518. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. Among matters of that sort probably few would doubt that both usage and

preponderant opinion give their sanction to enforcing the primary conditions of successful commerce. One of those conditions at the present time is the possibility of payment by checks drawn against bank deposits, to such an extent do checks replace currency in daily business. If then the legislature of the state thinks that the public welfare requires the measure under consideration, analogy and principle are in favor of the power to enact it. Even the primary object of the required assessment is not a private benefit as it was in the cases above cited of a ditch for irrigation or a railway to a mine, but it is to make the currency of checks secure, and by the same stroke to make safe the almost compulsory resort of depositors to banks as the only available means for keeping money on hand. The priority of claim given to depositors is incidental to the same object and is justified in the same way."

The holding in that case meets the contention of counsel for receiver, that the money of intervener, Security State Bank of Lawrence, is taken to pay interest on claims against the Nebraska State Bank, a private purpose, by the following language of the syllabus: "Where the mutual advantage is a sufficient compensation, an ulterior public advantage may justify a comparatively insignificant taking of private property for what in its immediate purpose is a private use." The mutual advantage is the protection each state bank receives from every other state bank, and the public advantage is the safety of the deposits.

It is argued that the "currency of checks is made just as secure whether interest be paid on deposits or not. Likewise, paying interest on deposits out of the guaranty fund does not in any manner tend to make safe compulsory resort of depositors to banks as the only available means for keeping money on hand. The protection of their money is not increased one bit by according priority of payment to interest." And it is suggested that the protection of interest is entirely unnecessary for the public welfare or the carrying on of successful commerce. The argument assumes that the reasons given by Justice Holmes in the above case are

the only ones which may be adduced in support of the legislation. Whether or not this is correct we need not at this time determine, for we are of the opinion that they are broad enough to cover the present situation. Counsel quotes from 12 C. J. 929, sec. 441, as follows:

"In order that a statute or ordinance may be sustained as an exercise of the police power, the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals, or general welfare, that there is some clear, real and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised."

This is without doubt a correct statement of the general principles governing the question of the validity of an attempted exercise of the police power; but it must be borne in mind that such power resides in the legislature; and that their determination of the necessity for its exercise is entitled to great weight, and that all presumptions are in favor of the law's validity. The police power is construed liberally in favor of the general public, and not strictly in favor of individual interests. If there is any reasonable doubt as to whether a police regulation is invalid, such doubt should be resolved in favor of its validity. *Cream City Bill Posting Co. v. Milwaukee*, 158 Wis. 86. It would seem, therefore, that the validity of the enactment is dependent, not so much upon the question as to whether or not the court is able to point out some particular public purpose intended to be subserved or accomplished, but whether or not, upon a comprehensive view of the situation, the legislature had reasonable ground for concluding that the enactment of the law was demanded by the public necessity or public welfare.

It is said that a police regulation may be valid up to a certain point, and invalid beyond. *Burns Baking Co. v. Bryan*, 264 U. S. 504. This presents no difficulty, neither a

solution of the present problem. If the protection of interest is without the police power, it may be so declared without disturbing the holding as to the corpus of the deposit.

At the time of the enactment of the law in question, the general nature of the business of banking was well understood. The fact that it received deposits, upon some of which it paid interest and others not, must have been in contemplation of the lawmakers, and yet they made no distinction between deposits of one kind or the other. It would seem to follow that in their judgment the legislature considered that the public welfare demanded the safety of all classes of deposits. In fact, an interest-bearing deposit is just as much a deposit within the banking law as one without interest, and the act itself recognizes this fact by its limitation of interest to a certain rate if the deposit is to be within the protection of the guaranty fund.

Now, interest is a mere incident to the deposit. It is just as much a part of it as a man's arm is a part of his body. It has no separate existence. It lives or dies with the thing upon which it depends for existence. The deposit is the amount due from the bank to the depositor, and includes interest when lawfully contracted for. Such is the thing which the legislature has determined should be protected in the interest of public welfare. To dismember it and invalidate the law because, considered separately, some particular reasons for sustaining it are of more force when applied to one part than to another, in our judgment, would be subjecting the broad legislative discretion to unwarranted dissection. We are unable to perceive that the extension of protection to interest is any less reasonable than the deposit itself from which it is inseparable. We conclude that the allowance by the district court of interest at 4 per cent. to the date of the closing of the bank was correct.

■ One further question remains to be considered, viz.: Is the depositors' guaranty fund chargeable with interest on the claim at 7 per cent. from the date of its allowance by the district court? In several cases we have held that

the allowance of the claim amounted to a judgment and came under the general provision of the statute that judgments shall draw interest at 7 per cent. It is contended by counsel for receiver that these decisions were rendered at a time when the guaranty fund was solvent and able to pay all claims certified to it under the law, but that at the time of the trial there were approximately $7,000,000 in claims certified for payment and unpaid because there were no funds in the depositors' guaranty fund to pay the same; and, further, that the maximum assessment authorized by law at that time in any one year was $1,650,000. Evidence of these facts appears of record. Attention is also called to the fact that by section 8028, Comp. St. 1922, as amended by section 26, ch. 191, Laws 1923, the maximum assessment for replenishing the fund is one-half of 1 per cent. of the average daily deposits of banks, whereas prior thereto the assessment permitted was 1 per cent. of the average daily deposits. It is therefrom argued that, inasmuch as the delay in payment of the deposits is attributable to the law itself, no interest should be allowed.

The argument *ab inconvenienti* is of considerable force and its rejection results in leaving the guaranty fund charged with a burden of staggering weight, but we would not be justified in relieving it unless in accordance with legal principles applicable to the facts of the case. As above noted, we have held in a number of cases that upon the allowance of the claim it draws interest at 7 per cent. per annum until paid. Among these cases may be cited: *State v. Farmers State Bank,* 113 Neb. 679, *State v. Octavia State Bank,* 116 Neb. 825, and three cases of *State v. Security State Bank,* 116 Neb. 521, 526, and 530, in which claims were allowed "with interest as provided by law." The question now presented was not discussed in any of those cases, but the principle upon which the holdings are based is that the allowance of the claim is in the nature of a judgment and is therefore within the operation of section 2836, Comp. St. 1922, providing that judgments shall bear interest at 7 per cent. unless a greater rate is provided for

in the contract upon which it is based. *State v. Farmers State Bank,* 113 Neb. 679.

But it is argued that it was also held in the case last cited that no interest should be allowed upon the certificate after maturity and until the allowance of the claim in the receivership proceedings, for the reason that "the delay in payment may be said to be the delay of the law," and that the same reason is applicable to the present case. The situations are not analogous. Here failure of payment is not due to the processes of the law, but the failure of the law itself to make adequate provision for payment. Certificates of deposit generally provide that interest stops at maturity. From that time the deposit falls into the class of general deposits not drawing interest, and it seems just that no interest should be allowed upon it against an insolvent bank until judgment. The present case is in closer analogy to that of a debtor who by lack of foresight or other cause is unable to pay his debt when due. We know of no principle which would justify a refusal of interest in such case on those grounds.

It is still further contended that the claim is in the nature of one against the state, and therefore interest is not allowable. The proceedings we are examining are specifically provided for by the guaranty fund act for the purpose of determining the claims against the bank. Such claims are not against the state in any sense and the state is not liable therefor. It is therefore difficult to discover the basis for the contention that the allowance of interest against the state is involved. *Lankford v. Platte Iron Works Co.,* 235 U. S. 461, is cited as holding that the title to the guaranty fund is in the state. That case involved a statute of Oklahoma and merely followed the decision of the state court in *State v. Cockrell,* 27 Okla. 630, four justices dissenting. It was an action in equity to compel the state banking board to pay plaintiff's claims out of the state guaranty fund, and the court held: "The state courts of Oklahoma having held that the statute creating the state banking board intended to give the state a definite title to the depositors'

guaranty fund, the fact that the fund is to be used to satisfy claims of beneficiaries does not take its administration from the officers of the state or subject them to judicial control."

The present action does not seek in any manner to control the administration of the fund, but merely to establish a claim against it in the manner pointed out by the act. And if it be considered in any sense an action against the department of trade and commerce or the guaranty fund commission, it is one provided for by the act itself. There is nothing that we said in the case of *Svoboda v. Snyder State Bank*, 117 Neb. 431, contrary to the views herein expressed.

The provisions of the Oklahoma statute with reference to the relation of the state to the guaranty fund differ from those of this state and the *Lankford* case is therefore not controlling. We do not deem it necessary in the disposition of this case to determine where the title to the guaranty fund is vested.

We conclude that the judgment of the district court is right and should be affirmed.

AFFIRMED.